UNITED STATES of America, Plaintiff,

v.

The INCORPORATED VILLAGE OF ISLAND PARK, Jacqueline Papatsos, in her capacity as Mayor of the Incorporated Village of Island Park, Charlotte Kikkert, in her capacity as Trustee of the Incorporated Village of Island Park, Philip Taglianetti, in his capacity as Trustee of the Incorporated Village of Island Park, James Fallon, in his capacity as Trustee of the Incorporated Village of Island Park, Michael A. Parente, James G. Brady, Francis R. McGinty, Michael Masone, Geraldine McGann, Harold Scully, Daniel McGann, Eileen McGann, Anthony Ciccimarro, Janet Ciccimarro, Joseph Ruocco, Debra Ruocco, Mary Ellen Guerin, Dennis Guerin, Joseph DiDomenico, Maria DiDomenico, Donna Moore and Kenneth Moore, Defendants.

No. CV–90–0992.

United States District Court,
E.D. New York.

April 24, 1992.

Larry Noyer, Asst. U.S. Atty., Brooklyn, N.Y., for U.S.

William H. Pauley, III, Snitow & Pauley, New York City, for defendants The Incorporated Village of Island Park, Jacqueline Papatsos, Charlotte Kikkert, Philip Taglianetti and James Fallon.

Allen R. Morganstern, P.C., Mineola, N.Y., for defendants Michael Parente, James Brady and Francis McGinty.

Thurm & Heller, New York City, for defendant Michael Masone.

Dikranis & O'Shea, Long Beach, N.Y., for defendant Geraldine McGann.

James W. Dougherty, Malverne, N.Y., for defendants Daniel and Ellen McGann.

Rosner & Goodman, New York City, for defendants Anthony and Janet Ciccimarro.

Dreyer & Traub, New York City, for defendants Joseph and Debra Ruocco, Mary Ellen and Dennis Guerin, Joseph and Maria DiDomenico, and Kenneth and Donna Moore.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Who will guard the guardians? The complaint that underlies this action alleges a profoundly disturbing abuse of government programs and of government funds by officials and residents of a small municipality. And yet, the undisputed facts material to the disposition of this motion reveal a still more disturbing failure by the federal officials charged with oversight of those programs to ensure the just and lawful administration of these affairs. Now the government, which for so long permitted these alleged misdoings to proceed with impunity, has brought suit after the time in which to present most of its claims has passed. The government urges that its own failure to enforce the public trust in a timely manner should be disregarded. But "even wrongdoers are entitled to assume their sins may be forgotten," *Wilson v. Garcia*, 471 U.S. 261, 271, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985); and it is unworthy of those charged with the protection of the public interest to decline blame for their own lack of vigilance.

This action arose from the administration of a Community Development Block Grant Program ("CDBG Program") and of a Section 235 Housing Program and from the alleged misuse of Housing and Urban Development ("HUD") funds in those programs by the Village of Island Park, New York ("Island Park" or the "Village") between 1979 and 1983. The government filed this action on March 22, 1990; it filed an amended complaint on May 11, 1990. The amended complaint lists eight causes of action: (1) violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq.; (2) fraud; (3) violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.; (4) breach of fiduciary duty; (5) aiding and abetting breach of fiduciary duty; (6) unjust enrichment; (7) constructive trust; and (8) erroneous payment of funds. The government has named as defendants: The Incorporated Village of Island Park; Jacqueline Papatsos (as mayor of Island Park); Charlotte Kikkert, Philip Taglianetti, and James Fallon (as trustees of Island Park); and, as individual defendants, Michael A. Parente, James G. Brady, Francis R. McGinty, Michael Masone, Geraldine McGann, Harold Scully, Daniel McGann, Eileen McGann, Anthony Ciccimarro, Janet Ciccimarro, Joseph Ruocco, Debra Ruocco, Mary Ellen Guerin, Dennis Guerin, Joseph DiDomenico, Maria DiDomenico, Donna Moore, and Kenneth Moore. All defendants have moved this court for summary judgment as to all causes of action on the ground that the applicable limitations period for each claim expired before the government filed its complaint. The defendants also argue that certain administrative proceedings conducted against the defendant Geraldine McGann have preclusive effect in this action. For the reasons set forth below, the motion of the defendants for summary judgment is granted in part and denied in part.

## FACTS

Section 235 of the National Housing Act, 12 U.S.C. § 1715z, established the Section 235 Program to provide mortgage-assistance subsidies to enable lower income families to acquire homes. Pursuant to the 235 Program, HUD makes monthly payments to a mortgagee to subsidize the payments made by a participating mortgagor. The housing is built by a private developer who obtains mortgage commitments from a HUD-approved lender and who applies to HUD for approval of the development.

Island Park administered such a Section 235 Program: It purchased land with CDBG funds obtained from Nassau County and resold the property to participating developers. Under the Island Park Section 235 Program, 44 single-family homes were constructed in the municipality over a four-year period that began in 1979. The homes were built in three phases: Five were built in the first phase; 22 were built in the second; and 17 were built in the third segment of development.

The Halandia Group constructed and marketed the five homes in the first phase of the program. An Affirmative Fair Housing Market Program ("AFHMP") was submitted to HUD with respect to the first phase pursuant to 24 C.F.R. §§ 200.600. On February 14, 1980, HUD approved the AFHMP and stated that:

> The selecting or giving of preference to prospective purchasers ... is not permitted. Transactions should be entered on a first-come-first-serve basis. The principal standard in determining compliance with the Affirmative Fair Housing Marketing Plan is diligent good faith effort.

Defendants' Exhibit 11. The Nassau Office of Housing reported to HUD that the five homes of the first phase were purchased by four white families and one Hispanic family. Defendants' Exhibit 12.

The developer for the second phase of the Section 235 Program was Ocean Park Properties, Inc. The AFHMP for this segment of the program was approved with similar caution from HUD as to the use of preferences in selecting recipients of the homes. Defendants' Exhibit 14. No AFHMP was submitted for the third phase of the Program.

The government alleges that Island Park preselected non-black residents of the Village to receive the Section 235 houses. At

the direction of then mayor Michael Parente (a defendant in this action), Village clerk Harold Scully and his staff gave the preselected persons advance notice of advertisement for the houses and instructed these persons to bring informal applications to the Village Hall on the morning the advertisements were scheduled to appear. In this way, the government alleges, the Village of Island Park was able to award the Section 235 houses—for which there were to be federally subsidized mortgages—to preselected individuals while maintaining the guise of a regular and impartial "first-come, first-served" process. Many of these preselected individuals either served the Village in official capacities or were related to others who held office in Island Park. No black family received a Section 235 home in Island Park.

Of particular interest to the government is the conduct of defendant Geraldine McGann. During the time of the administration of the third segment of the Section 235 Program, she was both a Village trustee *and* the Special Assistant to HUD Regional Administrator Joseph Monticciolo; she is alleged to have voted on HUD-related matters in her capacity as a trustee of Island Park during her tenure as a HUD employee. The government also alleges that, during the third phase of the program, she arranged for her son, defendant Daniel McGann, to receive one of the HUD houses. The government alleges that McGann participated in a "conspiracy" to cover up the misdoings of the officials of Island Park by, *inter alia*, drafting a letter to HUD for the signature of Mayor Parente that denied any wrongful acts in the administration of the Island Park Program. Plaintiff's Exhibit F. Further, the government alleges that McGann (and possibly Monticciolo) may have attempted to remove documents from HUD in 1990.

However, allegations of wrongdoing by McGann were formally considered after the government, on March 22, 1990, served a Notice of Proposed Removal on her as a HUD employee. Defendants' Rule 3(g) Statement ¶ 77. Several of the charges against McGann were initially sustained by HUD Associate General Deputy Assistant Secretary for Housing James E. Schoenberger. Defendants' Exhibit 58. McGann appealed this determination to the Merit Systems Protection Board ("MSPB") before which a full evidentiary hearing—including direct and cross-examination of witnesses—was conducted on March 21, 1991. Defendants' Rule 3(g) Statement ¶¶ 82–83. After that hearing, Administrative Judge Joseph E. Clancy dismissed all charges against McGann. Defendants' Exhibit 60. The government did not appeal this decision to the United States Court of Appeals for the Federal Circuit.

The government contends that it did not learn of the wide-spread wrongdoing by officials of Island Park until press reports in June of 1989. Government's Rule 3(g) Statement ¶ 138. However, HUD first began to receive complaints about the administration of the Section 235 Program in Island Park in late 1981. Defendants' Exhibit 17. And, by letter dated June 10, 1983, the clerk of the Village of Island Park, Harold Scully, notified HUD as to the race and the ethnic background of all the home recipients: He informed HUD that forty white families, three Hispanic, and no black families received houses.[1] Defendants' Exhibit 23.

Moreover, from late 1983 through early 1984, HUD conducted an extensive internal investigation into allegations of misconduct in the administration of the Section 235 Housing Program in Island Park. This investigation revealed to HUD auditors that the Village had preselected recipients of the Section 235 houses. Defendants' Exhibit 30. Indeed, Abraham Levy, the Regional Inspector General for Audit for HUD Region II, concluded in late November of 1983 that the government had legally actionable claims against the Village of Island Park for its abuse of the Section 235 Program. Defendants' Exhibit 35.

The audit report was issued on March 2, 1984 by the HUD Office of the Inspector

---

1. Although 44 homes were built under the Section 235 Program, the letter from Scully reports the race of only 43 families. Neither party has offered any explanation for this discrepancy.

General. Defendants' Rule 3(g) Statement ¶ 66. The findings of that report, Defendants' Exhibit 50, merit extensive quotation:

> The review disclosed no evidence of an aggressive and good faith effort to market the Section 235 homes to the general public and particularly to minority and non-minority groups outside the Village, or to provide an equal opportunity for housing.
>
> An examination of Village and Nassau County files showed that public advertisements for the second stage of housing were first published on November 19, 1981. On the same morning at 9:00 a.m. purchasers were "selected" by the Village for all 22 homes available. There were no formal applications stating family size, income, employment, etc., on which the Village could have based its selections, and all 22 applications consisted of informal hand-delivered letters, date stamped November 19, 1981, the same date as the public advertisements. Each letter was marked in pen as received at 9:00 a.m., and were numbered one through 22.
>
> . . . . .
>
> The review also disclosed that the Village did not publicly advertise for the third stage of 17 homes; however, purchasers were selected who were not included in the batch of unsuccessful applications (about 120 apparently received after the 22 successful applicants) during stage two. One of these 18 purchasers is the son of [Geraldine McGann,] Village Trustee and Special Assistant to the HUD Regional Administrator–Regional Housing Commissioner.
>
> . . . . .
>
> No minority families were selected under stage three of the Village's program and only two minority families were selected in stage two.
>
> . . . . .
>
> As discussed above, the Village apparently prescreened prospective purchasers prior to the public advertisements, and selected all 22 applicants on the first morning of the date that the advertisement appeared in the local newspapers. In addition, as discussed below, since the Village apparently gave preference to families of Village residents as well as to families of Village officials and employees, the intent and spirit of equal opportunity for housing was circumvented, and a genuine first come-first serve basis for selection was rendered meaningless.

This report, which details misdeeds in the Village of Island Park, was widely disseminated throughout HUD. Defendants' Rule 3(g) Statement ¶¶ 68–69.

The government contests neither the existence nor the content of the audit report. Rather, the government argues that the defendants engaged in a "fraudulent concealment" of their wrongdoing and thereby prevented the government from initiating this action until after June of 1989. The government alleges that the preselection process for participation in the Section 235 Program was a "self-concealing scheme." Memorandum of Government at 70. Also, the government alleges, the defendants falsely represented to HUD as early as 1982 that the administration of the Section 235 Program was fair and impartial. Government's Rule 3(g) Statement ¶¶ 64–71. Then, during the time of the HUD audit, the government charges, McGann drafted a letter for then-Mayor Parente to send to HUD; that letter denied any irregularities or improprieties in the administration of the housing program. Government's Rule 3(g) Statement ¶¶ 89–90. According to the government, McGann and Village clerk Scully also fraudulently amended her voting record as a Village trustee to conceal her votes on HUD-related matters; they each then informed HUD that the earlier record of her votes had been in error. Government's Rule 3(g) Statement ¶¶ 100–103. Finally, as a last element of the alleged "cover-up", the government charges that Joseph Monticciolo, who was then the HUD Regional Administrator, had immediate responsibility to act on the conclusions of the HUD audit report; but Monticciolo apparently proceeded no further with the investigation. Government's Rule 3(g) Statement

¶ 95. From this, the government infers that Monticciolo may have been a member of the "conspiracy" in Island Park—a conspiracy, the government argues, formed for the abuse of government programs and of government funds.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." These two requirements are plainly conjunctive. In this case, there is no dispute of any material fact that precludes this court from rendering judgment on the affirmative defenses of the relevant time bars and of claim and issue preclusion.

## I. STATUTES OF LIMITATIONS

A. *The Beginning of the Limitations Periods*

The government does not dispute that, for most of its causes of action, the applicable limitations periods began to run as a matter of law no later than March 2, 1984—the day that HUD released its audit report concerning the administration of the Section 235 Program in Island Park. *See, e.g.,* Memorandum of Government at 59 n. 14 and at 67. Indeed, the government concedes that, as to the second cause of action and as to parts of the sixth and the eighth causes of action, "the government is not entitled, as a matter of law, to defeat the statute of limitations defense." *Id.* at 5. Rather, the government contends that—with respect to the second, the fourth, the fifth, the sixth, and the eighth causes of action—the beginning of the limitations periods were tolled until June of 1989. With respect to the first cause of action, the government contends that the applicable limitation period did not begin until the Department of Justice learned of these matters—also in June of 1989. With respect to the third and the seventh causes of

action, the government contends that no statute of limitations is applicable. Nonetheless, it is clear that, as to these latter two causes of action, the claims accrued no later than did the claims of the second, the fourth, the fifth, the sixth, and the eighth causes of action. Thus, the government nowhere contends that—absent the claimed tolling—the applicable limitations periods for every cause of action (other than the first) would not have begun to run, as a matter of law, by March 2, 1984.

 This concession of the government is well-advised. The general rule concerning the commencement of the running of a limitations period is that the statute of limitations is triggered when the plaintiff's claim first arises. This in turn generally occurs either when the defendant actually commits the acts that give rise to the plaintiff's action or when the plaintiff either knows or reasonably should know of the facts that are material to his right of action. *See, e.g., Delaware State College v. Ricks,* 449 U.S. 250, 259, 101 S.Ct. 498, 505, 66 L.Ed.2d 431 (1980) (in Title VII action "the limitations period commenced to run when the [employment] decision was made and [the plaintiff] was notified"); *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981) ("[F]ederal law ... 'establishes as the time of accrual that point ... when the plaintiff knows or has reason to know of the injury which is the basis of his action.' ") (quoting *Bireline v. Seagondollar,* 567 F.2d 260, 263 (4th Cir.1977), *cert. denied,* 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979)); *Rodriguez v. Village of Island Park, Inc.,* CV–89–2676, at 12, 1991 WL 128568 (E.D.N.Y. July 2, 1991) (discovery standard of when plaintiff knows or has reason to know of defendant's wrongdoing is "more liberal" accrual rule than moment-of-injury standard); *Gerasimou v. Ambach,* 636 F.Supp. 1504, 1509 (E.D.N.Y.1986) ("Generally, a cause of action accrues when a plaintiff 'knows or has reason to know' of the injury or event that is the basis of his claim.") (quoting *Singleton,* 632 F.2d at 191). *Compare* 28 U.S.C. § 2416(c) (stat-

utes of limitations on actions brought by the United States are tolled as long as "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances....").

Hence, the government does not contest that, with respect to all but the first cause of action, the applicable limitations periods began to run as a matter of law no later than March 2, 1984. Rather, the government simply argues that these periods were tolled by the "fraudulent concealment" of the defendants until June of 1989—when attorneys for the Department of Justice read a newspaper account of the Island Park affair.

B. *The Applicable Statutes of Limitations*

The parties vigorously dispute the applicable statutes of limitations for the eight claims of the amended complaint. As a general proposition, the third and the seventh claims may be separated from the other six insofar as they seek equitable relief: The government contends that no statute of limitations applies against it in such an action. Also, the government contends that the first cause of action did not accrue until June of 1989. The other five claims are for damages.[2]

1. The First Claim for Relief

■ The defendants argue that the applicable statute of limitations for the first cause of action, violation of the False Claims Act, is six years under 31 U.S.C. § 3731(b). The government agrees that Section 3731(b) sets forth the applicable limitation period, but it contends that subsection (b)(2) renders its claim timely. Section 3731(b) provides in its entirety:

A civil action under section 3730 may not be brought—

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

The government argues that "the official of the United States charged with responsibility to act in the circumstances" is the appropriate official at the Department of Justice ("DOJ"); thus, the government argues, the six-year limitation period of Section 3731(b)(1) is tolled until the "facts material to the right of action are known or reasonably should have been known by" that official at DOJ. Memorandum of Government at 44. The government argues that "it is undisputed that the Department of Justice did not learn of the facts at issue [regarding the misdeeds in Island Park] until less than a year before suit was brought when an article appeared in The New York Times." Memorandum of Government at 49. Hence, even though the violations of the False Claims Act occurred more than six years before this lawsuit and even though the highest officials at HUD had documented the relevant facts, the government maintains that the cause of action under the False Claims Act is timely because it was brought within three years of the time when lawyers at DOJ first happened upon an account of the events at Island Park in a newspaper.

**2.** The government contends that, as to the first, the sixth, and the eighth claims, any wrongful acts by the defendants since March 22, 1984 are actionable as separate rights of action. Thus, the government argues that, even if this court should find no tolling of the statutes of limitations through fraudulent concealment, parts of the first, sixth, and eighth claims are still timely. However, the court does not decide today whether these three claims for relief can be subdivided into distinct causes of action such that "portions" of the claims may have arisen within the applicable limitations periods and may thus still be timely. Rather, the court simply affirms the tautological proposition that *if* parts of the first, the sixth, and the eighth claims state separate actionable claims that arose within the limitations period, those segments of the claims would be timely as a matter of law.

The position of the government—that "the official of the United States charged with responsibility to act in the circumstances" refers only to an official at DOJ—is, however, somewhat problematic. For instance, that argument rests in part on the proposition that the Attorney General has the exclusive power to enforce the False Claims Act. And, indeed, it is clear under Section 3730 that actions under the False Claims Act may only be initiated either by the Attorney General of the United States or by a private person in the name of the United States. In the case of the second type of action (qui tam), the Attorney General has the power to proceed with the action on behalf of the United States, and this "private" action may not be dismissed without the consent of the Attorney General. As stated by the Federal Circuit: "Regardless of who initiates the suit, the Attorney General is *specifically* authorized to administer such claims for the government." *Martin J. Simko Const., Inc. v. United States,* 852 F.2d 540, 547 (Fed.Cir. 1988). The court there construed this specific authorization of power to prosecute claims under the False Claims Act to be exclusive of other segments of the government. *Id.* ("No other agency is empowered to act under the statute."). Nonetheless, actions under the False Claims Act have been brought not by the Attorney General but by government corporations—in their own names. *See, e.g., Federal Crop Ins. Corp. v. Hester,* 765 F.2d 723 (8th Cir.1985). The government proposes no satisfactory explanation for the apparent conflict between those authorities that hold that *only* the Attorney General (or a private actor suing in the name of the United States) may bring suit under the False Claims Act and those authorities in which this "rule" clearly does not bar suit by a federal corporation that proceeds in its own name. But to the extent that federal corporations or federal agencies may in fact sue to enforce the False Claims Act, the argument that "the official ... charged with responsibility to act" designates only officials within the DOJ is correspondingly less persuasive.

Second, the government correctly points out that the legislative history of the False Claims Amendments Act—which added Section 3731(b)(2) to the statute—construes the phrase "the official of the United States charged with responsibility to act in the circumstances" to require knowledge "by an official within the Department of Justice with the authority to act in the circumstances." S.Rep. No. 345, 99th Cong., 2d Sess. 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5295.[3] That passage of the Senate Report, which purports to construe Section 3731(b)(2), provides in full:

> Subsection (b) of section 3731 of title 31, as amended by section 3 of the bill, would include an explicit tolling provision on the statute of limitations under the False Claims Act. The statute of limitations does not begin to run until the material facts are known by an official within the Department of Justice with the authority to act in the circumstances.[4]

Although this provision appears straightforward, its presence does raise new difficulties. For example, it is not clear why the Congress would have enacted the broader language of the statute—language that appears to leave open the question of who "the official ... charged with responsibility to act" may be—if the Congress "intended" that "the official" be narrowly construed as only someone within DOJ. Even the legislative history itself is not univocal on the specificity found in that one passage of the Senate Report. For in-

---

**3.** It appears clear that the phrase "with the authority to act in the circumstances" found in the Senate Report is a simple, if regrettably imprecise, reformulation of the statutory phrase "charged with responsibility to act in the circumstances...." The two phrases will thus be treated as equivalent for these purposes.

**4.** As ultimately passed, the tolling provision of the False Claims Act was located in Section 5 (not Section 3) of the False Claims Amendments Act. However, "section 3" of an earlier draft of the bill (to which the Senate Report refers) was identical in phraseology to the final draft in Section 5 of the enacted version. Thus, the mistaken reference in the committee report to "section 3" should be disregarded.

stance, the same Senate Report elsewhere reformulates the changes proposed by Section 3731(b)(2):

> [T]he subcommittee added a modification of the statute of limitations to permit the Government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when *the Government* learned of a violation, whichever is later.

S.Rep. No. 345 at 15, 1986 U.S.C.C.A.N. at 5280 (emphasis added). Further, the False Claims Act—including the modifications made by the False Claims Amendments Act—refers elsewhere to "the Attorney General" of the United States. *See* Section 3730. It is again not clear why the False Claims Act should specify that the "Attorney General" has the sole power to perform certain functions under the False Claims Act and yet leave unclear on the face of the statute whether "the official of the United States charged with responsibility to act" is in fact *only* the Attorney General. The case law since the False Claims Amendments Act has not made this difficulty any easier to explain. *Compare United States v. Macomb Contracting Corp.*, 763 F.Supp. 272, 274 (M.D.Tenn. 1990) ("The 'official of the United States charged with responsibility' could only have been the appropriate official of the Civil Division of the Department of Justice, which alone has the authority to initiate litigation under the Act.") *with United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 777 F.Supp. 195 (N.D.N.Y.1991) ("the facts material to relator's cause of action were known, in 1979 by the senior [Army] officials in charge of the Black Hawk project. Thus, those facts were known, or reasonably should have been known, by officials with the responsibility to act.").

In the face of patently inconsistent authority, this court will nonetheless construe the tolling provision of Section 3731(b)(2) with reference to the legislative history;

thus, "the official ... charged with responsibility to act" must be "an official within the Department of Justice with the authority to act in the circumstances." However, it does not necessarily follow, as the government argues, that the limitations period under Section 3731(b) was tolled until lawyers at DOJ read about the Island Park affair in a newspaper article. Rather, the limitations period was tolled until "the facts material to the right of action [were] known or reasonably should have been known" by that DOJ official.[5] That is, under the "reasonably should have been known" standard, the limitation period under Section 3731(b) may run even while officials at DOJ are unaware of the "facts material to the right of action." Further, this possibility of tolling "of course[ ] assumes due diligence on the part of the party charged with the responsibility of uncovering the fraud." *United States v. Uzzell*, 648 F.Supp. 1362, 1367 (D.D.C. 1986).

In this case, the officials at DOJ "should have ... known" of the misdeeds at Island Park by March 2, 1984—the day on which HUD released an audit report that alleged extensive wrongdoing by Island Park officials and residents. That audit report was widely disseminated throughout the United States government; any one of the many offices to which it was sent could have—and should have—referred the matter to the Department of Justice. At the very least, "due diligence" on the part of DOJ personnel should have uncovered "the facts material" in this case: To hold that the common knowledge of the Island Park affair at all levels of the federal government cannot reasonably be attributed to the Department of Justice is to ignore the basic fact that HUD and DOJ are both subdivisions of the same branch of the same government. Indeed, as Section 3730 makes clear, for purposes of prosecuting violations of the False Claims Act, DOJ serves as the "litigator" for the rest of the

---

5. Once again, the Senate Report proves itself inartfully drafted. As formulated there, the tolling provision operates until "the material facts are known by an official within the Department of Justice...." This phraseology suggests an actual knowledge standard that is inconsistent with the plain meaning of Section 3731(b)(2); as such, to the extent that it implies that the "reasonably should have been known" standard is inapplicable, it must be disregarded.

government; in this case, DOJ was to act as the "advocate" for its "client"—HUD. In that the Attorney General is charged with responsibility to represent the government in any False Claims Act action, and in that powerful officials at HUD knew of the activities in Island Park, it cannot be but that the Department of Justice "should have ... known" through the exercise of "due diligence" about these matters at the time that they were well known throughout the rest of the United States government. It would be absurd indeed to conclude that an official audit report of a cabinet-level department does not foreclose tolling of the limitations period but that a happenstance review of a newspaper article initiates the running of the clock against the government.

The audit report of 1984 was detailed in its account and widely dispersed in the government; indeed, it was so widely available that it was cited extensively by the newspaper article from which the government now claims that DOJ personnel first learned of misdeeds in Island Park. *See* Michael Winerip, "D'Amato, His Village and Favoritism in Housing," *The New York Times*, June 8, 1989, section A, page 1. Because, then, the Department of Justice "should have ... known" on March 2, 1984 of the Island Park matter, the right of action under the False Claims Act became untimely on March 2, 1990.[6]

#### 2. The Second Claim for Relief

Both parties agree that the second cause of action, common law fraud, is subject to a three-year limitations period under 28 U.S.C. § 2415(b). That section provides, in relevant part:

[E]very action for money damages brought by the United States ... which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues....

**6.** Again, the government argues that so much of its claim under this cause of action that arose *after* March 22, 1984 is still timely; although this court agrees that any action brought within the applicable limitations period is timely, the

Common law fraud is, of course, a cause of action that sounds in tort. As such, the parties are correct to conclude that Section 2415(b) is applicable to the fraud claim of the government. However, because the "right of action [for fraud] first accrue[d]" on March 2, 1984—at the *latest*—the second cause of action is time-barred. Thus, the government must rely on tolling of the time limitation in order to salvage this claim.

#### 3. The Third Claim for Relief

■ The third cause of action brought by the government is for violation of the Fair Housing Act, 42 U.S.C. §§ 3601–3631. In this claim, the government seeks a declaratory judgment, civil penalties, and injunctive relief. Amended Complaint at ¶ 121.

The government argues that no statute of limitations applies to an action brought—as is this one—under Section 3614(a). First, "courts have long held that the United States is not bound by any limitations period unless Congress explicitly directs otherwise." *United States v. City of Palm Beach Gardens*, 635 F.2d 337, 339 (5th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). *See also Guaranty Trust Co. v. United States*, 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938) ("quod nullum tempus occurrit regi"). As stated by the learned commentators, Hart and Wechsler:

In some instances, the United States comes into court not simply on par with private litigants, but with a number of advantages, court-made as well as statutory. There is, for example, a doctrine that the United States is not bound by statutes of limitations (or by laches) unless expressly provided by statute.

P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 916 (3d ed. 1988).

court does not decide on this motion whether events after March 22, 1984 in fact constitute separate actionable violations of the False Claims Act.

In this case, the government argues that, because the Fair Housing Act provides for no statute of limitations on an action brought by the Attorney General under Section 3614(a) and because no other federal statute of limitations applies to such an action, there is no time bar to which this suit is subject. Section 3614(a) provides:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

The government contends that Section 3614(a), enacted in its present form in 1988, is a recodification of former Section 3613.[7] The government argues, and the defendants concede, that actions brought by the Attorney General under old Section 3613 were not subject to any statute of limitations. Memorandum of Defendants at 11 ("Under a predecessor statute, 42 U.S.C. § 3613, 'pattern and practice' litigation brought by the Attorney General was not generally subject to a statute of limitations."). *See, e.g., United States v. City of Parma, Ohio,* 494 F.Supp. 1049, 1094 n. 63 (N.D.Ohio 1980), *aff'd,* 661 F.2d 562, 573 (6th Cir.1981) (180–day limitation period applicable to Fair Housing Act suits by private persons held inapplicable to action by Attorney General). But the defendants argue that present Section 3614(a) is not a simple recodification of former Section 3613 and that Congress has in fact enacted time limitations on suits brought by the Attorney General.

The defendants are correct that Congress did impose time bars on Fair Housing Act suits by the Attorney General, but it is clear that none of the new limits applies to a suit under Section 3614(a). Rather, the time limits apply to entirely new causes of action created by the Fair Housing Amendments Act. These actions, as well as their limitations periods, are found in Section 3614(b):

> (1)(A) The Attorney General may commence a civil action in any appropriate United States district court for appropriate relief with respect to a discriminatory housing practice referred to the Attorney General by the Secretary [of HUD] under section 3610(g) of this title.
>
> (B) A civil action brought under this paragraph may be commenced not later than the expiration of 18 months after the date of the occurrence or the termination of the alleged discriminatory housing practice.
>
> (2)(A) The Attorney General may commence a civil action in any appropriate United States district court for appropriate relief with respect to breach of a conciliation agreement referred to the Attorney General by the Secretary [of HUD] under section 3610(c) of this title.
>
> (B) A civil action may be commenced under this paragraph not later than the expiration of 90 days after the referral of the alleged breach under section 3610(c) of this title.

These new types of Fair Housing Act suits that may be brought by the Attorney General are applicable only in particular circumstances. The action under Section 3614(b)(1) applies only to an action referred to the Attorney General by the Secretary of HUD when "the Secretary determines

---

**7.** Former Section 3613 provided: "Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of rights granted by this subchapter."

that the matter involves the legality of any State or local zoning or other land use law or ordinance...." Section 3610(g)(2)(C). The action under Section 3614(b)(2) applies only to an action referred to the Attorney General by the Secretary of HUD "[w]henever the Secretary has reasonable cause to believe that a respondent has breached a conciliation agreement...." Section 3610(c). These two new types of actions that may be brought by the Attorney General are simply inapplicable to this case; this action does not involve "the legality of any State or local zoning or other land use law or ordinance" nor does it involve the breach of a "conciliation agreement." That Congress enacted statutes of limitations for these two specific rights of action by the Attorney General does not, without more, compel the conclusion that Congress also enacted a statute of limitation for the right of action under Section 3614(a). It is not enough for the defendants to suggest that there were statutes of limitations "in the air, so to speak" when Congress recodified former Section 3613 into present Section 3614(a).

Furthermore, the legislative history, although terse, appears to confirm that Congress did not intend to alter or to modify the power of the Attorney General to bring suit under Section 3614(a). The House Report to the Fair Housing Amendments Act, which recodified former Section 3613 as present Section 3614(a) and also added Section 3614(b), provides:

> [Section 3614(a)] continues the authority of the Attorney General to initiate civil actions in "pattern or practice" cases and in cases where denial of rights to a group raises an issue of general public importance. This section also gives the Attorney General authority to commence zoning or other land use law cases referred under Section [3610(g)(2)(C)], breach of conciliation agreement cases referred under Section [3610(c)], and to enforce subpoenas.

H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 40 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2201. There is simply no intimation that Congress intended to add to Section 3614(a) a limitations period;

rather, Congress sought *to continue* the power of the Attorney General under Section 3613—a power that, as the defendants concede, was not bounded by any bar of time.

The result here—that this action by the United States under the Fair Housing Act is not subject to any statute of limitations—is perhaps a result not often to be desired. As the Supreme Court observed in *Wilson v. Garcia*, 471 U.S. 261, 271, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985):

> A federal cause of action "brought at any distance of time" would be "utterly repugnant to the genius of our laws." *Adams v. Woods*, 2 Cranch 336, 342 [2 L.Ed. 297] (1805). Just determinations of fact cannot be made when, because of the passage of time, the memories of witnesses have faded or evidence is lost. In compelling circumstances, even wrongdoers are entitled to assume that their sins may be forgotten.

Nonetheless, the result in this case is the function—possibly even the unintended function—of the interstitial nature of federal law: Whether it was by accident or design that Congress provided no limitation period on a suit for injunctive relief brought by the Attorney General under the Fair Housing Act, and whether it was by accident or design that Congress has not enacted a general statute of limitations for actions brought by the United States seeking equitable remedies, these failures of Congress to legislate limitations periods cannot be read other than as against the judicial doctrine that the United States is not subject to statutes of limitations unless Congress expressly provides otherwise. And though it may be "'utterly repugnant to the genius of our laws,'" it is a result not without precedent. *See City of Palm Beach Gardens*, 635 F.2d at 339–41 (because Hill–Burton Act provided for no statute of limitations and because general federal limitations periods were inapplicable, United States not subject to time bar in suit under Hill–Burton Act). Hence, insofar as the government seeks injunctive re-

lief under the Fair Housing Act, its claim is timely brought.[8]

However, the part of this claim for relief that seeks civil penalties is not without a controlling statute of limitations. Rather, 28 U.S.C. § 2462 provides, in relevant part:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued....

The government argues that the five-year limitations period of Section 2462 is inapplicable to this case because it has been "otherwise provided by Act of Congress." It reasons that, because the civil penalties are sought under Section 3614(a), the limitations period of *that* section (which, of course, does not exist) must govern. More precisely, the government seeks civil penalties under Section 3614(d), which provides, in relevant part:

> (1) In a civil action under subsection (a) or (b) of this section, the court—
> (A) [may award injunctive relief]
> (B) [may award damages]
> (C) may, to vindicate the public interest, assess a civil penalty against the respondent....

According to the government, these civil penalties—like the injunctive relief and the damages of Section 3614(d)(1)(A), (B)—are simply an example of the relief available under a Section 3614(a) action. Thus, the government contends: "[Section] 3614(d) describes the types of relief available in [a Section 3614(a) suit]. It follows inexorably, since § 3614(a) has no statute of limitations, that no statute of limitations applies to all types of relief available, and the Government's request for civil monetary penalties for violations of the Fair Housing Act in this action are [sic] subject to no time bar." Memorandum of Government at 34.

The argument of the government is flawed in two respects. First, no statute of limitations applies to the action under Section 3614(a) because Congress failed to provide one; this *absence* of legislative provision is not equal to an affirmative provision otherwise by Congress. Thus, the failure of Congress to provide any statute of limitations to Section 3614(a) cannot be said to override the default limitations period set forth in Section 2462. Indeed, it may well be that Congress enacted present Section 3614 both with an eye toward the rule that the United States is not subject to statutes of limitations unless otherwise provided *and* with an eye toward Section 2462. The government suggests no principled basis on which this court should heed the mandate of the first of these default rules but disregard the equally clear command of the latter.

Second, to characterize Section 3614(d)(1)(C) as simply setting forth the relief available under the substantive right of action of Section 3614(a) is not by any means to demonstrate that the limitations rule of the former applies to the latter. Indeed, civil penalties are *always* simply one of the "types of relief" available under a substantive cause of action. On the analysis of the government, Section 2462 would never apply to any case brought by the United States because either: (1) the substantive right of action would have an express statute of limitations—in which case that express limitations period would apply to the civil penalties part of the suit; or (2) the substantive right of action would have no express statute of limitations—in which case no limitations period would apply to the civil penalties part of the suit. The absurdity of this proposition is compounded by the recognition that the government is almost always the plaintiff in a suit for "the enforcement of any civil fine, penalty, or forfeiture"—and that, in fact, Section 2462 applies *only* to actions brought by the United States. *Bertha Building Corp. v. National Theatres Corp.*, 269 F.2d 785, 788–89 (2d Cir.1959), *cert. denied*, 361 U.S. 960, 80 S.Ct. 585, 4 L.Ed.2d 542 (1960) ("The federal statute of limitations for penal actions [28 U.S.C.

---

**8.** The general limitations periods of 28 U.S.C. § 2415 apply only to actions for money damages; thus, they are, of course, not applicable to an action for injunctive relief.

§ 2462] applies only to actions on behalf of the United States and *qui tam* actions."). On the reasoning of the government, then, Section 2462 would have only rare—if any—application. It would, in fact, be all but meaningless.

Indeed, the phrase "[e]xcept as otherwise provided by Act of Congress" strongly implies that the Congress intended Section 2462 to apply precisely to actions such as this—in which the substantive right of action under which the United States sues does not contain an express limitations period. There is nothing about Section 2462 or about Section 3614 to suggest that it cuts against the intent of Congress that the government's action for injunctive relief be subject to no time bar but that the government's action for civil penalties be barred after five years. Hence, although the Fair Housing Act claim of the government for injunctive relief is timely, the portion of the third claim for relief that seeks civil penalties was barred after March 2, 1989—five years after the release of the HUD audit report.

### 4. The Fourth Claim for Relief

■ The defendants contend that the fourth cause of action, breach of fiduciary duty, is subject to the three-year limitation period of 28 U.S.C. 2415(b).[9] The government, however, correctly maintains that the applicable period is *six* years under 28 U.S.C. § 2415(a). That latter section provides, in relevant part:

[E]very action for money damages brought by the United States ... which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues....

The case law is reasonably clear that actions by the United States against its own employees for breaching duties of loyalty are contractual and are thus subject to the limitations period of Section 2415(a). *See United States v. Boeing Co., Inc.*, 845 F.2d 476, 482 (4th Cir.1988), *rev'd on other grounds*, 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (Acceptance of remuneration by government employee from source other than United States "constitutes a breach of the duty of loyalty, and is contractual in nature.... Therefore, the six year statute of limitations in 28 U.S.C. § 2415(a) applies."); *Jankowitz v. United States*, 533 F.2d 538, 548 (Ct.Cl.1976) ("We think that the obligation of an agent of the Government to account to his principal for a payment illegally received, since premised upon an obligation created by law, and not upon the apparent mutual consent of the parties, derives from a contract implied in law within the meaning of 28 U.S.C. § 2415(a) (1970)".). Thus, the fourth claim for relief is subject to a six-year limitation period.

■ However, the right of action for this claim arose on March 2, 1984 (at the latest), and this suit was not filed until six years and twenty days later on March 22, 1990.[10]

---

9. The relevant portion of this section is quoted above with respect to the second cause of action.

10. The government has twice intimated that defendant McGann committed actionable breaches of fiduciary duty after March 2, 1984. First, the government has stated: "A tape recording made at a Village Board meeting in 1988 shows conclusively that McGann, as a Village trustee, violated her ethical obligation to HUD by identifying herself as a HUD employee at a Village Board meeting and by then discussing HUD funding for a proposed swimming pool in the Village." Memorandum of Government at 65. And, at oral argument on this motion, the government suggested that, because McGann had allegedly drafted a letter to the HUD Acting Regional Counsel on March 26, 1984, the entirety of the fourth cause of action was rendered timely. However, these intimations are inconsistent with the position of the government that McGann "breached her fiduciary duty to HUD as the result of her hidden involvement in the Village's Section 235 program" but that the "statute of limitations was tolled ... under the fraudulent concealment doctrine." Memorandum of Government at 60–61. To the extent that the government seeks to make out separate actions for breach of fiduciary duty against McGann for actions after March 22, 1984, the government should so plead; however, her letter of March 1984 and her participation in a board meeting in 1988 do not in themselves defer the accrual of the fourth cause of action nor do they stay the commencement of the applicable limitations period.

Thus, the government again argues that the statute of limitations was tolled by reason of the fraudulent concealment of the defendants; the government also argues that this limitations period was tolled pursuant to 28 U.S.C. § 2416(c). Absent such tolling, the fourth cause of action, like the second, is completely time-barred.

### 5. The Fifth Claim for Relief

The fifth cause of action, aiding and abetting a breach of fiduciary duty, is an action in tort. As such, 28 U.S.C. § 2415(b) applies a three-year limitations period.[11] As with the other claims, the fifth cause of action accrued by March 2, 1984; it therefore became untimely by March of 1987.

### 6. The Sixth Claim for Relief

With respect to the sixth cause of action, unjust enrichment, the parties agree that 28 U.S.C. 2415(a) applies a six-year limitation period to suits by the United States that are brought "upon any contract express *or implied in law or fact*" (emphasis added). Because unjust enrichment is a species of implied contract, the six-year limitations period of Section 2415(a) is applicable. Once again, however, that period has run—at least with respect to any incidents of unjust enrichment that occurred before March 22, 1984.

### 7. The Seventh Claim for Relief

In the seventh cause of action, the government seeks to impose a constructive trust upon the Section 235 homes of the defendants and to force them to disgorge any "profits" they have realized through their misdeeds. The defendants argue that a cause of action that seeks to impose a constructive trust is a common-law action and that the courts of the State of New York apply a six-year statute of limitations to such a suit:

> Since a cause of action for a constructive trust is one "for which no limitation is specifically prescribed by law," it is governed by New York's six-year statute of

limitations, N.Y.Civ.Prac.Law and Rules (CPLR) 213(10 (McKinney 1972) and runs from the occurrence of the wrongful act or event which creates a duty of restitution. *See ... Augustine v. Szwed*, 77 A.D.2d 298, 301, 432 N.Y.S.2d 962 (4th Dep't 1980)....

*Dolmetta v. Uintah National Corp.*, 712 F.2d 15, 18 (2d Cir.1983). Contrary to the suggestion of the defendants, however, *Dolmetta* does not control; that case was a diversity action under New York law. But:

> It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights.... The same rule applies whether the United States brings its suit in its own court or in a state court.

*United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) (citations omitted). *See also Chevron, U.S.A., Inc. v. United States*, 705 F.2d 1487, 1491 (9th Cir.1983) (citing *Summerlin*); *United States v. Podell*, 572 F.2d 31, 35 n. 7 (2d Cir.1978) (same). Thus, notwithstanding that the government brings this cause of action pursuant to the law of the State of New York, the New York statute of limitations applicable to actions for a constructive trust does not apply to the United States in this case.

Furthermore, any action by the United States "is subject to no time limitation, in the absence of congressional enactment clearly imposing it." *DuPont de Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 366, 68 L.Ed. 788 (1924). *See also United States v. Weintraub*, 613 F.2d 612, 619 (6th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980) ("While the general rule ... is that the sovereign is exempt from the operation of statutes of limitations, an exception to that general rule exists when the sovereign (through the legislature) expressly imposes a limitation period upon itself."). In this case, there is no statute of limitations applied by Congress to an action for construc-

---

**11.** The relevant portion of that statute is quoted above in the discussion of the second cause of action.

tive trust. Moreover, both Section 2415(a) and Section 2415(b) apply only to actions "for money damages." However, an action for constructive trust and for disgorgement is not for "money damages;" rather, it is an action for equitable relief, and Congress has prescribed no statute of limitations for such an action brought by the United States. Because there is in fact no applicable limitation period set out by Congress for such an action, the seventh claim for relief is timely in its entirety.

### 8. The Eighth Claim for Relief

█ Finally, the parties agree that the eighth cause of action, erroneous payment of funds, is subject to a six-year limitations period; they agree that 28 U.S.C. § 2415(b) governs this as "an action to recover for diversion of money paid under a grant program." This limitations period began to run, as did the others, no later than March 2, 1984; this cause of action is therefore untimely.

By way of brief summary, then: The part of the third cause of action that seeks injunctive relief and the entirety of the seventh cause of action are timely; the first, the sixth, and the eighth causes of action are timely only insofar as they pertain to *possible* causes of actions that may have accrued after March 22, 1984; the rest of the first, the third, the sixth, and the eighth claims—as well as the second, the fourth, and the fifth causes of action in their entirety—are untimely and can only be saved by a tolling of the statutes of limitations.

### II. TOLLING AND ESTOPPEL

#### A. *Fraudulent Concealment*

█ The doctrine of fraudulent concealment provides for a tolling of the statute of limitations if the plaintiff establishes:

(1) that the defendant concealed from [the plaintiff] the existence of his cause of action, (2) that [the plaintiff] remained in ignorance of [that] cause of action until some point within [the applicable limitations period] of the commencement of [the] action, and (3) that [the plain-

tiff's] continuing ignorance was not attributable to lack of diligence on [the plaintiff's] part.

*State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988); *see also Rodriguez*, CV–89–2676, at 19–20. As the phraseology of the Second Circuit in *Hendrickson Bros.* suggests, the burden of proving fraudulent concealment "rests squarely on the party pleading [it]." *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443 (S.D.N.Y.1986). Further, it should be noted that the elements of fraudulent concealment are *conjunctive;* thus, the absence of any one of the three will defeat the operation of that tolling doctrine.

█ To consider only the second element, the government here must establish that it was ignorant of its causes of action until June of 1989. As the court remarked in *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985):

The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim. A key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings.

Furthermore, the statute of limitations is not tolled by fraudulent concealment once the plaintiff knows of the operative facts that form the basis of his claim such that he could discover his cause of action through the exercise of diligence. *Dayco v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975) ("Any fact that should excite his suspicion is the same as actual knowledge of his entire claim.") (citing *Wood v. Carpenter*, 101 U.S. 135, 25 L.Ed. 807 (1879)); *see also Wolf v. Wagner Spray Tech Corp.*, 715 F.Supp. 504, 509 (E.D.N.Y.1989) ("Courts have held that 'facts that should arouse suspicion ... are equated with actual knowledge of the claim.' ") (quoting *Donahue*, 633 F.Supp. at 1443). *Compare* 28 U.S.C. § 2416 (stat-

utes of limitations in Section 2415 are tolled so long as "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act ..."). Thus, the government must show that it did not know of the existence of its causes of action until some time within three, five, or six years (as applicable) of March 22, 1990.

■ However, the government did in fact have actual knowledge of the facts underlying *all* of its causes of action on March 2, 1984—at the latest. On that date, Abraham Levy of the HUD Office of the Inspector General issued his audit report; the subject of that report was a "Review of Allegations Relating to the CDBG and Section 235 Programs Administered by the Incorporated Village of Island Park, Nassau County, New York." Defendants' Exhibit 50. The report outlined the "operative facts" on which the present action is based; indeed, the government has not even endeavored to controvert the defendants' extensive demonstration of the many parallels between the audit report and the amended complaint. *Compare* Defendants' Rule 3(g) Statement ¶ 76 *with* Government's Rule 3(g) Statement ¶ 109. As this court characterized the contents of that report in *Rodriguez*, CV–89–2676, at 9:

> [The audit report] concluded that the Village did not properly market the homes in a way which would adequately notify and attract all buyers within the housing market regardless of race, color, religion, sex, or national origin, as required by federal regulations. 24 C.F.R. 200.610–640. In addition, the report found that the Village apparently selected purchasers for these highly desirable homes on the basis of preferential considerations such as familial and other relationships with Village officials and residents.

The audit report further detailed extensive wrongdoing by defendant McGann:

> There appears to be a Standards of Conduct violation by Ms. Geraldine McGann and a conflict of interest in the selection of her son, Daniel McGann, as a home-

owner under the third stage of the Village's program.

. . . . .

> Ms. McGann has been a paid member of the Village Board of Trustees, since August 19, 1982. Ms. McGann apparently did not officialy [sic] notify the Regional Counsel of her Village employment or receive a determination as to the existence of a conflict of interest until ... after she had served on the Board ... for eight months. In addition, during these eight months Ms. McGann, acting in her capacity as Village Trustee, participated in several HUD-related decisions.

Defendants' Exhibit 50, at 10. It is indeed difficult to comprehend how the government can maintain that the filing of this HUD audit report does not defeat its claim that it "remained in ignorance of" the bases for its causes of action beyond March 2, 1984. *See, e.g., Boeing Co., Inc.,* 845 F.2d at 481–82 (existence of government audit memorandum inconsistent with claim of ignorance of facts material to cause of action).

The government contends that its argument for fraudulent concealment survives the damning existence of this report because: "(1) [the] defendants' fraudulent and outrageous acts concealed important *proof* in support of the allegations and (2) [then HUD Regional Administrator and Regional Housing Commissioner Joseph] Monticciolo, the official with responsibility to take administrative action in response to the Audit Report, may have been part of the conspiracy." Government's Memorandum of Law at 68. These contentions, however, do not change the result. First, the government has cited no case, and understandably so, to support the proposition that a plaintiff remains in "ignorance of the existence of his cause of action" until he has *proof* of the wrongdoing; indeed, the government elsewhere retreats from this novel proposition and confesses that knowledge of facts sufficient to establish a prima facie case will defeat a fraudulent concealment claim. *Id.* at 65. Second, regardless of whether Monticciolo was or was not a "part of the conspiracy" at Is-

land Park,[12] the audit report was widely disseminated throughout HUD and throughout other government agencies; this the government does not dispute. *See* Defendants' Exhibit 50, at 16; Government's Rule 3(g) Statement ¶¶ 95–99. Indeed, the defendants aver, and the government does not deny, that "Paul Adams, Inspector General of HUD, was also briefed on the allegations several months before the report was issued." Defendants' Memorandum of Law at 18. *See* Defendants' Rule 3(g) Statement ¶ 54; Government's Rule 3(g) Statement ¶ 84. It is clear, then, that the government—the plaintiff in this action—knew of the "existence of [its] cause[s] of action" no later than March 2, 1984—six years and twenty days before it filed this lawsuit; it is clear that the doctrine of fraudulent concealment does not toll the applicable statutes of limitations in this action.

B. *Tolling under 28 U.S.C. § 2416(c)*

 The government also contends that the six-year statute of limitations applicable to the fourth claim for relief (breach of fiduciary duty by McGann) was tolled until June of 1989 under 28 U.S.C. § 2416(c). That section provides in relevant part:

For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which—

. . . . .

(c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances....

There is a reasonable question whether or not Section 2416(c) simply codifies the doctrine of fraudulent concealment. For example, the legislative history of Section 2416(c) indicates that the Congress intended this section to apply in a manner analogous to the common-law rule of tolling by reason of a defendant's fraud:

The committee understands that the principal application of this exclusion will probably be in connection with fraud situations. An example would be where the affirmative act of a wrongdoer has served to conceal the fraudulent act. This type of exclusion is to be found in the law of many States in both fraud and tort limitations.

S.Rep. No. 1328, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.C.C.A.N. 2502, 2507. *See also United States v. Tilleraas*, 538 F.Supp. 1, 4 (N.D.Ohio 1981), *aff'd*, 709 F.2d 1088 (6th Cir.1983). Nonetheless, the court will proceed on the assumption that Section 2416(c) is not necessarily coextensive with the doctrine of fraudulent concealment and will therefore consider the argument of the government under the terms of that section rather than under the case law concerning the common-law rule.

On the text of the statute, the applicable limitations period may be tolled so long as the "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances...." The Senate Report clarifies that: "As a general proposition, the responsible official would be the official who is also responsible for the activity out of which the action arose." S.Rep. No. 1328, 1966 U.S.C.C.A.N. at 2507. In this case, the "responsible official[s]" were McGann's superiors at HUD.[13] Further,

---

**12.** The government contends that uncertainty as to the possible role that Mr. Monticciolo may have played in the Island Park schemes raise a genuine issue of material fact for trial. However, the only possible materiality of this fact would be if the fraudulent concealment claim were to stand or fall with his participation. But because the government had *notice* as well as *actual knowledge* of all the facts necessary for its causes of action on the day the audit report was filed and because that audit report was so widely disseminated throughout HUD, any role

which Mr. Monticciolo may have played in failing to conduct further investigations into the Island Park misdoings is immaterial to the fraudulent concealment claim of the government. That is, even if he *were* a "part of the conspiracy" the government would still not have a valid claim for fraudulent concealment.

**13.** The government does not contend, in this regard, that "an official of the United States charged with the responsibility to act" must be an official of the DOJ. That is, the government

the legislative history emphasizes that the "material facts that are not known must go to the very essence of the right of action." S.Rep. No. 1328, 1966 U.S.C.C.A.N. at 2508.

The government argues that, although the audit report detailed wrongdoing by McGann and although that audit report was so widely disseminated throughout HUD that the entire government is charged with knowledge of its content, McGann nonetheless so concealed her actions as to persuade the government that the conclusions of the audit report were incorrect and that the government had no claim against her. The government argues:

> After the March 2, 1984 Audit Report issued, [then Village clerk Harold] Scully wrote a letter to HUD dated March 16, 1984 stating that he had mistakenly recorded McGann's votes in the Village Board minutes as being "aye" on HUD related matters when in fact McGann had abstained on these matters. McGann, also after the Audit Report issued, wrote a letter to HUD wrongly stating that she had abstained on all HUD related matters, that she had played no part in the Village's Section 235 selection process, and that she did not help her son get a house. Because there was no evidence in 1984 that McGann had helped her son get a Section 235 home and, since after Scully's March 16, 1984 letter, there was no proof in 1984 that McGann *had* improperly voted on HUD related matters, HUD Regional Counsel incorrectly concluded that McGann had not engaged in improper conduct. Monticciolo concurred in this conclusion. Based upon the statements of Scully and McGann which "legitimately *alters* the conclusions as found in the Audit Report", Defs' Ex. 55, p. 3, the investigation into McGann's conduct was, on September 14, 1984, closed "administratively without further action." Defs' Ex. 56.

Memorandum of Government at 62–63. The government thus argues that "the official ... charged with responsibility to act" in the case of McGann did not know nor could he reasonably have known of the material facts until Scully began to discuss the matter in 1989. *Id.* at 63.

However, a close examination of the relevant documents reveals that, in fact, HUD decided not to pursue action against McGann on several of the allegations in the audit report for reasons other than her alleged concealment of material facts. First, a memorandum opinion from Steven Love, the Acting Regional Counsel for HUD, to Joseph Monticciolo, the Regional Administrator and Regional Housing Commissioner for HUD, dated April 6, 1984 "disagree[s] with the conclusions stated in the [audit] Report and conclude[s] that Ms. McGann has not violated the [relevant HUD] regulations." Defendants' Exhibit 52, at 1. As to the first allegation against her—that she had improperly accepted outside employment as a paid member of the Village Board of Trustees in violation of 24 C.F.R. § 0.735–204(a)—the HUD counsel concluded that she had been granted prior permission to be so employed and that she was therefore authorized to serve as a trustee under 24 C.F.R. § 0.735–204(c)(2). *Id.* at 2. Further, it is clear from his opinion that HUD counsel confirmed this grant of authorization with former HUD Regional Counsel Thomas P. Loftus; that is, HUD counsel did not conclude that McGann had not violated 24 C.F.R. § 0.735–204(a) because of any fraudulent representation made by McGann herself. Thus, it is not the case that the "facts material to the right of action" were not known by the appropriate official. Similarly, HUD officials concluded that the allegation that McGann had violated 24 C.F.R. § 0.735–205(a) could not be substantiated because that regulation was considered to be of dubious constitutionality. *Id.* Again, it is not the case that the govern-

---

does not argue that the phrase "an official of the United States charged with the responsibility to act" of Section 2416(c) is as narrow as the phrase "the official of the United States charged with responsibility" of Section 3731(b)(2) of the

False Claims Act. *See Boeing Co., Inc.,* 845 F.2d at 482 (government argued that the "official of the United States charged with responsibility to act" in Section 2416(c) was Department of Defense contracting officer).

ment closed its investigation of McGann on this question because it did not know of the "facts material to the right of action." Third, it is clear from a second HUD memorandum (dated June of 1984), that even after McGann's letter, HUD continued to investigate the possible improper use of influence by McGann in helping her son obtain a Section 235 home. Defendants' Exhibit 55, at 2. Thus, McGann's letter clearly had no effect on the HUD investigation of this allegation of misconduct.

Finally, although McGann and Scully wrote to HUD officials and argued that Village Board minutes incorrectly indicated inappropriate votes by McGann on HUD-related matters, it is still true that HUD officials either knew or reasonably should have known of the facts material to their right of action against her. On the one hand, HUD had an extensive audit report that detailed serious misdeeds by McGann; on the other hand, HUD received from McGann a letter in response to the audit report that denied those allegations and offered a patently dubious account of the manner in which McGann's votes had been incorrectly recorded. Yet HUD officials then closed this segment of their investigation into McGann on the basis of the bare assertions in her letter and in the letter of Harold Scully.

The government now argues that because McGann denied her wrongdoing and offered an alternate interpretation of events, the government could delay indefinitely the initiation of its action. But such acceptance of the denials of an accused are subject to the reasonableness requirement of Section 2416(c), and, in this case, the government could not reasonably accept McGann's denials as dispositive: A HUD auditor had concluded that McGann had improperly voted on HUD-related matters while she served as a Village trustee, and his report was distributed at the highest levels of HUD. Yet HUD was satisfied that the denials of McGann—who was, of course, the "accused"—were more credible

than its own internal auditor. Such a judgment is without any reasonable basis, and it therefore does not negate the fact that HUD officials reasonably should have known of the facts material to the right of action—nor does it negate the fact that these same HUD officials had actual knowledge of those facts. Thus, accession by the government to McGann's denial of misconduct is nothing other than a failure by the government diligently to prosecute its rights.[14] But Section 2416(c) does not toll the applicable limitations period when, as here, the government either knows or reasonably should know of its right of action, and the fourth cause of action was thus untimely brought.

## C. Equitable Estoppel

■ The government contends that the defendants concealed "proof" of their own wrongdoing and thereby precluded the government from filing suit in a timely manner. See Memorandum of Government at 75 ("When the defendants had completed their fraudulent cover-up, the only evidence which the government had in 1984 in support of the fraudulent preselection scheme was purely circumstantial."). Because the defendants denied the government "proof," the government argues, the defendants are equitably estopped from asserting the statutes of limitations as a bar to these causes of action.

The government refers the court to the opinion of Justice Black for the Supreme Court in Glus v. Brooklyn Eastern Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). There, agents of the respondent employer represented to the petitioner that he had seven years in which to sue under the Federal Employers' Liability Act; in fact, the statute provided a three-year limitations period. The district court dismissed the petitioner's action as untimely brought, and the court of appeals affirmed. The Supreme Court reversed with the directive that:

---

**14.** That the government failed in the diligent assertion of its rights is further demonstrated by the fact that the complaint in this action was not filed until March 22, 1990—more than nine months after the government claims that its attorneys "first" learned of the events at Island Park through a newspaper article.

[P]etitioner is entitled to have his cause tried on the merits if he can prove that respondent's responsible agents, agents with some authority in the particular matter, conducted themselves in such a way that petitioner was *justifiably* misled into a good-faith belief that he could begin his action at any time within seven years after it had accrued.

*Glus*, 359 U.S. at 235, 79 S.Ct. at 763 (emphasis added). The government cites this case for the proposition that the maxim "no man may take advantage of his own wrong" may be "employed to bar inequitable reliance on statutes of limitations." *Id.* at 232–3, 79 S.Ct. at 762. However, the Court referred there to *Schroeder v. Young*, 161 U.S. 334, 16 S.Ct. 512, 40 L.Ed. 721 (1896) in which, like the petitioner in *Glus*, the plaintiff had been " 'lulled into a false security' " by the representations of the defendant that the time bar would not be invoked against him. Those cases are clearly inapplicable here: The government in no manner contends that the defendants "lulled" the government "into a false security" concerning the time in which the government could file its action.

It appears that the government would have this court seize the principle iterated in *Glus* that "no man may take advantage of his own wrong" and hold that, because the defendants committed a "wrong" in attempting to conceal their misdeeds, they may not now assert the defense of the statute of limitations. But the principle thus formulated is of such generality that it would apply to any defendant who initially denied his liability and then later asserted a time bar. A more precise, and, accordingly, more instructive formulation of the governing principle is also found in *Glus*:

As Mr. Justice Miller expressed it in *Insurance Co. v. Wilkinson*, 13 Wall. 222, 233 [20 L.Ed. 617], "The principle that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage...."

*Id.* 359 U.S. at 233–4, 79 S.Ct. at 762. The defendants here did not "induce[ ]" the government to "give [them] an advantage." Rather, the defendants denied their liability, denied the facts upon which the government seeks to predicate liability, and sought to persuade the government that another set of facts was true. *See, e.g., Schmidt v. Polish People's Republic*, 579 F.Supp. 23, 30 (S.D.N.Y.), *aff'd*, 742 F.2d 67 (2d Cir.1984) (creditor plaintiffs claimed that debtor defendant " 'lulled [them] into a false sense of security that certain notes would be paid without resort to litigation,' " but defendant had repeatedly denied liability on notes; held no equitable tolling of statute of limitations). Even on the assumption that these representations of the defendants were false, such representations are not an inducement to surrender an advantage. Rather, denials of this sort—and even lies, if they are such—are almost invariably the first line of defense for those accused of civil liability by potential plaintiffs. But plaintiffs who are confronted with defendants in this posture have available to them the mechanisms of modern discovery by which to move closer to the true facts of a given case—by which to force concessions or, at the least, to frame issues for trial. To hold that a defendant who attempts to conceal from a plaintiff those matters about which the plaintiff already knows may not later assert the bar of time in his favor would be to foreclose the operation of the statute of limitations for any action in which the defendant did not concede liability before the complaint itself is filed. In short, this case does not present any "advantage" to the defendants about which "it would be against equity and good conscience" to allow them to assert.

Rather, it is of the essence of equitable estoppel that the party sought to be estopped must have set forth a representation, promise, or inducement that dissuades the plaintiff from timely bringing suit: "[A]ll that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representation in forbear-

ing suit." *Bomba v. W.L. Belvidere, Inc.,* 579 F.2d 1067, 1071 (7th Cir.1978). In this case, the only "conduct or representation" of the defendants to which the plaintiffs refer is their alleged "concealment of proof." But, as has been demonstrated above, this "concealment" was of facts already known by the government; and if the government knew of the operative facts, it cannot have "reasonably rel[ied] on this "concealment" "in forbearing suit." What the government tries to accomplish here is in fact an "end-run" around the requirement that a party pleading fraudulent concealment must be "in ignorance of his cause of action." *Hendrickson Bros., Inc.,* 840 F.2d at 1083. This they may not do. *Compare Smith v. Smith,* 830 F.2d 11, 12 (2d Cir.1987) (under New York law, plaintiff who knows "true facts" cannot assert equitable estoppel) *with Renz v. Beeman,* 589 F.2d 735, 750 (2d Cir.1978), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979) (under New York law, plaintiff may assert equitable estoppel against defendant if fraudulent statements of defendants *actually* conceal from plaintiff "facts essential to make out the cause of action").

## III. CLAIM AND ISSUE PRECLUSION

### A. *Preclusion of Causes of Action against McGann*

■ The defendant Geraldine McGann argues that certain administrative proceedings brought by HUD against her have preclusive effect in this litigation. Those proceedings began with a "Notice of Proposed Removal" dated March 22, 1990 (the "Notice"). Defendants' Exhibit 57. That Notice contained five charges of violations of HUD standards: (1) "actions which might have resulted in, or created the appearance of giving preferential treatment in violation of HUD's standards of conduct;" (2) "actions which might have resulted in, or created the appearance of losing independence and impartiality in violation of HUD's standards of conduct;" (3) "actions which might have resulted in, or created the appearance of excluding blacks and Hispanics from receiving benefits of a

program administered by the Department in violation of HUD's standards of conduct;" (4) "actions which might have resulted in, or created the appearance of adversely affecting the confidence of the public in the integrity of the government;" and (5) "failure to cooperate during an official investigation." Further, the second charge included five "specifications": The first four of these involved specific instances in which McGann allegedly voted on HUD-related matters in her capacity as a Village trustee; the fifth alleged that, as a trustee, she had "reviewed and approved for payment, vouchers submitted by contractors for improvements to Section 235 property, which improvements were paid for in whole or in part by CDBG funds." Finally, the fourth charge involved two "specifications": Both concerned news articles relating to the Section 235 program at Island Park. *Id.*

In a report dated November 1, 1990, James E. Schoenberger, Associate General Deputy Assistant Secretary for Housing reviewed the charges against McGann. Defendants' Exhibit 58. He found evidence to sustain charges one, three, and five; he further sustained the fifth specification of charge two and the first specification of charge four. However, he disallowed the first four specifications of charge two and the second specification of charge four. *Id.* The findings of his review were adopted in a "Decision on Proposed Removal" issued by Arthur J. Hill, Acting Assistant Secretary for Housing, dated November 8, 1990. Defendants' Exhibit 59. Hill ultimately determined that McGann should be demoted and reassigned to a HUD office in New Jersey. *Id.*

McGann appealed the decision of Hill to the Merit Systems Protection Board (the "MSPB" or the "Board"). In a decision dated April 18, 1991, the MSPB, through Administrative Judge Joseph E. Clancy, dismissed all charges against her. Defendants' Exhibit 60. The MSPB dismissed the third charge even before the MSPB hearing because "Mr. Schoenberger's analysis of this charge ... specifically found that [McGann] had not been involved

in the Village's Section 235 housing marketing or selection process." *Id.* at 7. Further:

> The "charge" which the agency sustained was not the charge as set forth in the proposal notice. Indeed, as noted above, the agency specifically found that appellant had not participated in the housing selection process, as had been alleged. In this regard, an agency may not base an action upon charges to which an employee has not had an opportunity to respond. *See Huisman v. Department of Air Force,* 35 M.S.P.R. 378, 380 (1987). The agency's "formation" of this charge during the decision-making process was therefore invalid, and the charge is not sustained.

*Id.* at 8. The MSPB also dismissed the fifth charge "[a]t the conclusion of the agency's presentation of its case-in-chief" because it determined that the charge was in fact predicated on her exercise of her constitutional right against self-incrimination. *Id.* at 8–9.

The MSPB refused to sustain the first charge—a charge that involved allegations that McGann had helped her son obtain a Section 235 home—because "[t]he agency [i.e. HUD] found ... that [McGann] was not involved in the process, and played no role in her son's selection." *Id.* at 9. The MSPB deemed inadequate the theory of HUD that McGann had violated standards of conduct simply because she had failed to dissuade her son from participating in the program. The Board similarly dismissed the fifth specification of the second charge—that McGann had reviewed and approved vouchers for payment to contractors—because "[t]he documents and testimony ... showed that the Trustees, including [McGann], did not see any vouchers, nor were they routinely provided any specifics regarding the Village payment resolutions on which they voted." *Id.* at 10. Finally, it dismissed the first specification of the fourth charge—concerning adverse publicity—because it was "directly dependent upon the validity of the first charge concerning [McGann's] son." *Id.* at 11. Insofar as the first charge was found to be unsupported, the MSPB determined that

McGann "cannot be saddled with responsibility for publicity which adversely reflected upon the agency, as well as herself." *Id.* With all charges thus dismissed, the MSPB reversed the decision of HUD and ordered that McGann be restored to her former position. *Id.* at 12. The government declined to exercise its right to appeal this decision to the United States Court of Appeals for the Federal Circuit.

McGann now argues that these administrative proceedings have "res judicata" effect in this court. As a threshold matter, this court is perhaps well-advised to begin with a clarification of the terminology and of the doctrines that are often collected indiscriminately under the title "res judicata". This court can offer no better explanation than that of Judge Rubin in *Kaspar Wire Works, Inc. v. Leco Engineering and Machine, Inc.,* 575 F.2d 530, 535–6 (5th Cir.1978):

> The rules of *res judicata,* as the term is sometimes sweepingly used, actually comprise two doctrines concerning the preclusive effect of a prior adjudication. The first such doctrine is "claim preclusion," or true *res judicata.* It treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action." ... Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial.... The aim of claim preclusion is thus to avoid multiple suits on identical entitlements or obligations between the same parties, accompanied, as they would be, by the redetermination of identical issues of duty and breach.
>
> The second doctrine, collateral estoppel or "issue preclusion," recognizes that suits addressed to particular claims may present issues relevant to suits on other claims. In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties....

It is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.

With the distinction between "claim preclusion" and "issue preclusion" firmly in mind, then, the argument of defendant McGann is more readily adjudicated.

The Supreme Court has made clear that decisions of administrative agencies may have preclusive effect. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–2, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."). More specifically, decisions of the MSPB have the effect both of claim preclusion, *Spears v. Merit Systems Protection Board*, 766 F.2d 520, 523 (Fed. Cir.1985) (res judicata), and of issue preclusion, *Graybill v. United States Postal Service*, 782 F.2d 1567, 1571 (Fed.Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986) (collateral estoppel). However, the preclusive effect of an administrative determination "is limited to the purpose for which it was made." *Connecticut Light and Power Co. v. Federal Power Commission*, 557 F.2d 349, 353 (2d Cir.1977) (citing *Federal Trade Commission v. Motion Picture Advertising Service Co., Inc.*, 344 U.S. 392, 398, 73 S.Ct. 361, 365, 97 L.Ed. 426 (1953)).

Although claim preclusion bars relitigation of a "claim" or "cause of action", a second instance of litigation need not be styled identically to a first instance in order to be barred. Thus, a Fourth Amendment defense raised by a defendant in a criminal proceeding may bar a later claim under 42 U.S.C. § 1983. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). In other words, claim preclusion "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen*, 442 U.S. 127, 130, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). The general test, then, for such identity of claims is the identity of the underlying transaction:

Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.

*N.L.R.B. v. United Technologies Corp.*, 706 F.2d 1254 (2d Cir.1983).

In this case, McGann is named in five of the eight causes of action: violation of the False Claims Act (count one); fraud (count two); violation of the Fair Housing Act (count three); breach of fiduciary duty (count four); and erroneous payment of funds (count eight). All these counts put into issue "the same transaction or connected series of transactions" as was before the MSPB. Yet, the proceedings before the MSPB were only for the purpose of determining whether McGann had violated HUD standards of conduct; as such, the proceedings necessarily determined only the relationship of McGann to her employer. That is, the hearing and decision of the MSPB concerned whether or not McGann had breached her duties to HUD—her duties as an employee and as a fiduciary. Although the allegations of the first, the second, the third, and the eighth causes of action may have furnished a basis for her removal, the MSPB was without power to adjudicate those claims. As such, the proceedings before the MSPB do not preclude these causes of action in this suit. *Compare International Association of Machinists & Aerospace Workers*, 512 F.2d 125, 131 (5th Cir.1975) (proceedings before National Labor Relations Board not preclusive of contract action in state court because contract claim could not be brought before Board). Accordingly, there is no claim preclusion of those causes of action.

In that respect, the essence of the proceedings at the MSPB are superficially sim-

ilar to the fourth cause of action in the civil complaint. However, it is still the case that the preclusive effect of the MSPB decision "is limited to the purpose for which it was made." *Connecticut Light & Power Co.*, 557 F.2d at 353. Those proceedings were not held for the purpose of determining whether McGann was liable to the government for the monetary damages sought in the complaint under the fourth cause of action; and the MSPB could not have, in any event, made such a determination. This is more readily understood if considered as a counter-factual proposition: If the government had *prevailed* against McGann at the MSPB and had secured her removal or demotion, it would still have been necessary for the government to institute this action in order to establish not simply that she had violated HUD standards of conduct but that she had also breached her fiduciary duty to HUD and was therefore liable for damages. The MSPB would have been unable to make this finding. As such, the MSPB proceedings do not have the effect of claim preclusion on the fourth cause of action.

To determine that the MSPB proceedings do not have the effect of claim preclusion is not, however, to end the inquiry. Rather, issue preclusion still "bars the relitigation of issues actually adjudicated, and essential to judgement, in a prior litigation...." *Kaspar Wire Works, Inc.*, 575 F.2d at 535–36 (emphasis added). Because issue preclusion applies to matters litigated before the MSPB, it is necessary to examine which issues were "actually litigated and essential to judgment."

First, the first four specifications of the second charge, as well as the second specification of the fourth charge, were not presented to the MSPB; for that reason, none of the factual issues underlying those matters are precluded here. Next, the third charge—concerning McGann's alleged participation in the exclusion of blacks and Hispanics from the Section 235 Program—was dismissed by the ALJ before the hearing on the ground that the government had reformulated the substance of the charge. Accordingly, it was not "actually litigated" and is not precluded. So too, the facts underlying the first charge and the first specification of the fourth charge—McGann's alleged involvement in helping her son obtain a Section 235 house and the publicity concerning that alleged involvement—were not "actually litigated" by the parties; rather, the government conceded that she "was not involved in the process, and played no role in her son's decision." Defendants' Exhibit 60, at 9. Although these concessions by the government may be highly probative of these matters, they are not preclusive here.

Finally, the parties did actually litigate McGann's alleged involvement in the review and approval of payments on vouchers submitted by contractors—the substance of the fifth specification of the second charge. The MSPB found that the evidence "showed that ... [McGann] did not see any vouchers, nor [was she] routinely provided any specifics regarding the Village payment resolutions on which she voted." Defendants' Exhibit 60, at 10. The parties also litigated the question of McGann's alleged failure to cooperate with an official investigation—the substance of the fifth charge. The MSPB dismissed this charge after the government's case-in-chief because the evidence demonstrated that the charge centered on an invocation of the Fifth Amendment by McGann. *Id.* at 8–9. These findings preclude relitigation of those issues.

### B. *Preclusion as to other Defendants*

Finally, the other defendants argue that the proceedings before the MSPB have issue preclusive effect as to the counts of the complaint against them. The theory upon which they rely is nebulous at best. They appear to argue that the MSPB made findings as to the "manipulation" of the Section 235 Program at Island Park and as to the subsequent "cover-up" by the defendants. Memorandum of Defendants at 41–42. This is incorrect: The MSPB made no such determination; accordingly, preclusive effect does not attach to these matters.

### CONCLUSION

For the reasons set forth, the motion of the defendants for summary judgment is

granted in part and denied in part. The second, fourth, and fifth causes of action are entirely barred by the statutes of limitations. The first, sixth, and eighth causes of action are barred by the statutes of limitations to the extent they apply to events before March 22, 1984; those causes of action are not barred to the extent they apply to events after March 22, 1984—if such events are later determined to give rise to separate causes of action. The part of the third cause of action that seeks civil penalties is barred; the rest of that cause of action is timely. The seventh cause of action is timely in its entirety. Finally, none of the causes of action against defendant McGann is barred by claim preclusion; matters concerning her approval of payment vouchers and matters concerning her cooperation with the government's investigation are barred by issue preclusion.

SO ORDERED.