UNITED STATES of America, Plaintiff,

v.

**Geraldine McGANN, Defendant.**

No. CV–95–3209.

United States District Court,
E.D. New York.

Jan. 13, 1997.

Richard K. Hayes, Stanley N. Alpert, Charles S. Kleinberg, Assistant U.S. Attorneys, United States Attorney's Office, Eastern District of New York, Brooklyn, NY, for plaintiff.

Eugene F. McElroy, Mineola, NY, for defendant.

*MEMORANDUM AND ORDER*

GLASSER, District Judge:

This defendant has been before this court since March 22, 1990 when she was named as one among many defendants against whom the government commenced action. The complaint filed on that day was amended on May 11, 1990. The facts of the case and the first opinion addressing many of the issues to which those first complaints gave rise may be found in 791 F.Supp. 354 (E.D.N.Y.1992) (the "first opinion") familiarity with which is assumed. Another opinion addressing still further the issues in the case may be found in 888 F.Supp. 419 (E.D.N.Y.1995). Confining the historical background to this defendant, the specific cause of action pertinent to the motion now before the court and which will be hereafter addressed is the charge that she breached her fiduciary duty. In the first opinion that cause of action was held to be barred by the statute of limitations. In footnote 10 on page 368 of that opinion, forgetting the injunction of Sir Francis Bacon that "an overspeaking judge is no well-tuned cymbal," I overspoke and wrote "[t]o the extent that the government seeks to make out separate actions for breach of fiduciary duty against McGann for actions after March 22, 1984, the government should so plead." Understandably, perhaps, the government seized upon that violation of the Baconian injunction and on July 31, 1995 moved to amend the complaint of May 11, 1990 by repleading the cause of action against McGann for breach of fiduciary duty. A comparison of the complaint of May 11th with the complaint as it was sought to be amended will be useful.

| May 11, 1990 | July 31, 1995 |
|---|---|
| Wrongful Conduct by Geraldine McGann | Wrongful Conduct by Geraldine McGann |
| 86. On or about August 19, 1982, defendant Geraldine McGann became a paid Trustee of the Village. At all relevant times thereafter, she served simultaneously in that capacity and as Special Assistant to Joseph Monticciolo, the H.U.D. Regional Administrator for Region II. | 86. On or about August 19, 1982, defendant Geraldine McGann became a paid Trustee of the Village. At all relevant times thereafter, she served simultaneously in that capacity and as Special Assistant to Joseph Monticciolo, the H.U.D. Regional Administrator for Region II. |
| 87. Defendant Geraldine McGann owed a fiduciary duty to H.U.D. not to act in any manner inconsistent with the interests of H.U.D., and not to have any interest that conflicted, directly or indirectly, with the interests of H.U.D. | 87. Defendant Geraldine McGann owed a fiduciary duty to H.U.D. not to act in any manner inconsistent with the interests of H.U.D. and not to have any interest that conflicted, directly or indirectly, with the interests of H.U.D. Pursuant to this fiduciary duty, defendant Geraldine McGann was obligated to avoid even the mere appearance of impropriety or of conflict between the interests of H.U.D. and her interests or the interest of her friends, relatives, associates or other employees of H.U.D. |
| 88. Defendant Geraldine McGann breached the aforesaid fiduciary duty to H.U.D. in her conduct as a paid Trustee of the Village, including but not limited to the following: | 88. Defendant Geraldine McGann breached her fiduciary duty to H.U.D. in her conduct as a paid Trustee of the Village, including but not limited to the following: |
| (a) On or about December 9, 1982, while acting as a Trustee of the Village, she voted in favor of the Village purchasing property for use in the Section 235 housing program, which purchase was funded in whole or in part with CDBG funds as more fully alleged below; | (a) On or about December 9, 1982, while acting as a Trustee of the Village purchasing property for use in the Section 235 housing program, which purchase was funded in whole or in part with CDBG funds as more fully alleged below; |
| (b) Also on or about December 9, 1982, while acting as Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Two Section 235 housing; | (b) Also on or about December 9, 1982, while acting as Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Two Section 235 housing; |
| (c) In or about February 1983, while acting as a Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Three Section 235 housing; | (c) In or about February 1983, while acting as a Trustee of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Three Section 235 housing; |
| (d) Also in or about February 1983, while acting as a Trustee of the Village, she voted in favor of the Village accepting bids for site improvements respecting property used for Section 235 housing, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below; and | (d) Also in or about February 1983, while acting as a Trustee of the Village accepting bids for site improvements respecting property used for Section 235 housing, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below; and |

**May 11, 1990**

(e) At numerous different times relevant to this action, she reviewed and approved for payment vouchers submitted by contractors for improvements to Section 235 property, which improvements were paid for in

whole or in part by CDBG funds as more fully alleged below.

89. Defendant Geraldine McGann, while acting as a paid Trustee of the Village, voted in matters respecting the expenditure by the Village of H.U.D. funds for the purchase, sale and improvement of the property that was eventually purchased by her son, defendant Daniel McGann, and her daughter-in-law, defendant Eileen McGann.

90. Defendant Geraldine McGann knew and approved of the manipulation of Phases One and Two of the Section 235 Program by defendants Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown, as alleged above, and failed to disclose said manipulation to H.U.D.

91. Defendant Geraldine McGann did these acts, and others, with knowledge that defendants Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown were illegally manipulating the Section 235 Program in the manner set forth above.

**July 31, 1995**

(e) At numerous different times relevant to this action, she reviewed and approved for payment vouchers submitted by contractors for improvements to Section 235 property, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below.

(f) On or about March 26, 1984, in communications with H.U.D. concerning her alleged breaches of her fiduciary duty to H.U.D., she made affirmative misrepresentations, made statements which were deceptive, told half-truths which were misleading, and breached her affirmative duty to H.U.D. to make full and complete disclosure about, and not make material omissions about, prior wrongful conduct of the defendants in connection with H.U.D.-related matters, including her own prior breaches of fiduciary duty to H.U.D. Each of these March 26, 1984 misrepresentations, deceptive statements, misleading half-truths, material omissions, and failures to make full and affirmative disclosure of the following facts constituted new breaches of her fiduciary duty to H.U.D.:

(1) the other defendants had manipulated Phases One and Two of the Village's Section 235 program, as described above;

(2) she had reviewed and/or approved the list of Phase Three purchasers in connection with the Village's Phase Three selection;

(3) defendants Daniel and Eileen McGann had received a Phase Three house due to her procurement and arrangement;

(4) she secretly drafted the Village's earlier 1984 response to H.U.D.'s inquiries concerning the Village's alleged manipulation of the Section 235 program;

(5) the Village's earlier 1984 response to H.U.D. inquiries referred to in (f)(4) above was false, deceptive, misleading, and omitted material information in failing to fully describe the defendants' manipulation of the Section 235 program as set forth above;

July 31, 1995

(h) In or about August 1989, and thereafter, while being interviewed by members of the H.U.D. Inspector General's office, she made affirmative misrepresentations, made statements which were deceptive, told half-truths that were misleading, and breached her affirmative duty to H.U.D. to make full disclosure about, and not to make material omissions about, the wrongful conduct of the other defendants and her major breaches of her fiduciary duty. Each of these 1989 misrepresentations, deceptive statements, misleading half-truths, material omissions, and failures to make full and complete affirmative disclosure constituted a new breach of her fiduciary duty to H.U.D.;

(i) She engaged in all of conduct described herein wantonly, maliciously and with wrongful intent.

89. Defendant Geraldine McGann, while acting as a paid Trustee of the Village, voted on matters respecting the expenditure by the Village of H.U.D. funds for the purchase, sale and improvement of the property that was eventually purchased by her son, defendant Daniel McGann, and her daughter-in-law, defendant Eileen McGann.

90. Defendant Geraldine McGann knew and approved of the manipulation of Phases One and Two of the Section 235 Program by defendants Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown, as alleged above, and failed to disclose said manipulation to H.U.D.

91. Defendant Geraldine McGann did these acts, and others, with knowledge that defendants Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown were illegally manipulating the Section 235 Program in the manner set forth above.

(e) on numerous occasions while acting as a Village Trustee, she voted on, and failed to abstain from voting on, numerous H.U.D.-related matters including, but not limited to, one vote on October 20, 1982, three votes on November 16, 1982, two votes on December 6, 1982, two votes on March 17, 1983, one vote on April 21, 1983, and two votes on May 18, 1983;

(f) she wrote a letter dated February 17, 1984 asking that the Village minutes be changed to indicate that she had abstained from voting on H.U.D.-related matters when the Village minutes correctly documented that she had not abstained;

(g) she induced, and caused Mayor Parente to induce, Harold Scully to write a letter to H.U.D. on or about March 16, 1984 which falsely stated that the Village minutes indicating that she had voted on H.U.D.-related matters were inaccurate when, in fact, they were accurate;

(g) On or about May 3, 1984, she caused the false and misleading February 17, 1984 letter referred to in (f)(7) above to be submitted to the Village Board and to be reflected in the Village Board minutes;

(h) On numerous occasions after March 22, 1984, while acting as a Village Trustee, she voted on, and failed to abstain from voting on, numerous H.U.D.-related matters including, but not limited to, one vote on September 11, 1986, one vote on April 7, 1987, two votes on June 16, 1988, and one vote on August 18, 1988;

(i) On or about May 18, 1988, she caused Village Board records to be changed to wrongly indicate that on June 16, 1988 she had not voted on H.U.D.-related matters when in fact she had;

(j) In 1988, while acting as a Village Trustee, she directly participated in the Village's proposal to obtain Community Development Block Grant funds to build, among other things, a swimming pool, by meeting with and discussing the Village's proposal with other Village Trustees, by seeking community support for the Village's proposal, by writing articles, by trying to cause Village residents to withdraw their opposition to the Village's proposal, by openly discussing the Village's proposal in public at Village Board meetings and elsewhere, and by voting on matters connected with the Village's proposal;

---

In an opinion reported in 1995 WL 669936 (E.D.N.Y.1995), the court noted that the government offered no reason why it waited more than three years to amend that complaint after the issuance of the first opinion and denied the motion for the reasons that undue delay and undue prejudice dictated that result. The defendant's contention that the proposed amendment would, in any event, be futile, was, therefore, deemed unnecessary to consider.

Undeterred, on August 9, 1995, the government commenced another action bearing a new docket number in which Geraldine McGann was the only named defendant and charged once again with breaching her fiduciary duty. It is the motion to dismiss that complaint that is now before the court. A comparison of the complaint as it was proposed to be amended and this one is revealing.

July 31, 1995

August 9, 1995

Wrongful Conduct by Geraldine McGann

86. On or about August 19, 1982, defendant Geraldine McGann became a paid Trustee of the Village. At all relevant times thereafter, she served simultaneously in that capacity and as Special Assistant to Joseph Monticciolo, the H.U.D. Regional Administrator for Region II.

87. Defendant Geraldine McGann owed a fiduciary duty to H.U.D. not to act in any manner inconsistent with the interests of H.U.D. and not to have any interest that conflicted, directly or indirectly, with the interests of H.U.D. Pursuant to this fiduciary duty, defendant Geraldine McGann was obligated to avoid even the mere appearance of impropriety or of conflict between the interests of H.U.D. and her interests or the interest of her friends, relatives, associates or other employees of H.U.D.

88. Defendant Geraldine McGann breached her fiduciary duty to H.U.D. in her conduct as a paid Trustee of the Village, including but not limited to the following:

(a) On or about December 9, 1982, while acting as a Trustee of the Village, she voted in favor of the Village purchasing property for use in the Section 235 housing program, which purchase was funded in whole or in part with CDBG funds as more fully alleged below;

(b) Also on or about December 9, 1982, while acting as Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Two Section 235 housing;

(c) In or about February 1983, while acting as a Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Three Section 235 housing;

(d) Also in or about February 1983, while acting as a Trustee of the Village, she voted in favor of the Village accepting bids for site improvements respecting property used for Section 235 housing, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below; and

---

Wrongful Conduct by Geraldine McGann

81. On or about August 19, 1982, defendant Geraldine McGann became a paid Trustee of the Village. At all relevant times thereafter, she served simultaneously in that capacity and as Special Assistant to Joseph Monticciolo, the H.U.D. Regional Administrator for Region II.

82. Defendant Geraldine McGann owed a fiduciary duty to H.U.D. not to act in any manner inconsistent with the interests of H.U.D. and not to have any interest that conflicted, directly or indirectly, with the interests of H.U.D. Pursuant to this fiduciary duty, defendant Geraldine McGann was obligated to avoid even the mere appearance of impropriety or of conflict between the interests of H.U.D. and her interests or the interest of her friends, relatives, associates or other employees of H.U.D.

83. Defendant Geraldine McGann breached her fiduciary duty to H.U.D. in her conduct as a paid Trustee of the Village, including but not limited to the following:

(a) On or about December 9, 1982, while acting as a Trustee of the Village, she voted in favor of the Village purchasing property for use in the Section 235 housing program, which purchase was funded in whole or in part with CDBG funds as more fully alleged below;

(b) Also on or about December 9, 1982, while acting as Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Two Section 235 housing;

(c) In or about February 1983, while acting as a Trustee of the Village, she voted in favor of the Village selling land to Ocean Park Properties, Inc., which land was used to construct Phase Three Section 235 housing;

(d) Also in or about February 1983, while acting as a Trustee of the Village, she voted in favor of the Village accepting bids for site improvements respecting property used for Section 235 housing, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below; and

(e) At numerous different times relevant to this action, she reviewed and approved for payment vouchers submitted by contractors for improvements to Section 235 property, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below.

(f) On or about March 26, 1984, in communications with H.U.D. concerning her alleged breaches of her fiduciary duty to H.U.D., she made affirmative misrepresentations, made statements which were deceptive, told half-truths which were misleading, and breached her affirmative duty to H.U.D. to make full and complete disclosure about, and not make material omissions about, prior wrongful conduct of the defendants in connection with H.U.D.-related matters, including her own prior breaches of fiduciary duty to H.U.D. Each of these March 26, 1984 misrepresentations, deceptive statements, misleading half-truths, material omissions, and failures to make full and affirmative disclosure of the following facts constituted new breaches of her fiduciary duty to H.U.D.:

(1) the other defendants had manipulated Phases One and Two of the Village's Section 235 program, as described above;

(2) she had reviewed and/or approved the list of Phase Three purchasers in connection with the Village's Phase Three selection;

(3) defendants Daniel and Eileen McGann had received a Phase Three house due to her procurement and arrangement;

(4) she secretly drafted the Village's earlier 1984 response to H.U.D.'s inquiries concerning the Village's alleged manipulation of the Section 235 program;

(5) the Village's earlier 1984 response to H.U.D. inquiries referred to in (f)(4) above was false, deceptive, misleading, and omitted material information in failing to fully describe the defendants' manipulation of the Section 235 program as set forth above;

(e) At numerous different times relevant to this action, she reviewed and approved for payment vouchers submitted by contractors for improvements to Section 235 property, which improvements were paid for in whole or in part by CDBG funds as more fully alleged below.

(f) On or about March 26, 1984, in communications with H.U.D. concerning her alleged breaches of her fiduciary duty to H.U.D., she made affirmative misrepresentations, made statements which were deceptive, told half-truths which were misleading, and breached her affirmative duty to H.U.D. to make full and complete disclosure about, and not make material omissions about, prior wrongful conduct in connection with H.U.D.-related matters. Each of these March 26, 1984 misrepresentations, deceptive statements, misleading half-truths, material omissions, and failures to make full and affirmative disclosure of the following facts constituted new breaches of her fiduciary duty to H.U.D.:

(1) the manipulation of Phases One and Two of the Village's Section 235 program, as described above;

(2) she had reviewed and/or approved the list of Phase Three purchasers before the Phase Three purchasers were selected by the Village;

(3) Daniel and Eileen McGann had received a Phase Three house due to her assistance, insistence, procurement and arrangement;

(4) she secretly drafted the Village's response in 1984 to H.U.D.'s inquiries concerning the Village's alleged manipulation of the Section 235 program;

(5) the Village's 1984 response to H.U.D. inquiries which she drafted was false, deceptive, misleading, and omitted material information in failing to fully describe the defendants' manipulation of the Section 235 program as set forth above;

(6) on numerous occasions while acting as a Village Trustee, she voted on, and failed to abstain from voting on, numerous H.U.D.-related matters including, but not limited to, one vote on October 21, 1982, three votes on November 18, 1982, two votes on December 9, 1982, two votes on March 17, 1983, one vote on April 21, 1983, two votes on May 19, 1983;

378

(6) On numerous occasions while acting as a Village Trustee, she voted on, and failed to abstain from voting on, numerous H.U.D.-related matters including, but not limited to, one vote on October 21, 1985, three votes on November 18, 1985, two votes on December 9, 1985, two votes on March 17, 1987, one vote on April 21, 1987, and two votes on May 19, 1987;

(7) She wrote a letter dated February 17, 1984 asking that the Village minutes be changed to indicate that she had abstained from voting on H.U.D.-related matters when the Village minutes correctly documented that she had not abstained;

(8) She induced, and caused Mayor Parente to induce, Harold Scully to write a letter to H.U.D. on or to about March 16, 1984 which falsely stated that the Village minutes indicating that she had voted on H.U.D.-related matters were inaccurate when, in fact, they were accurate;

(g) On or about May 3, 1984, she caused the false and misleading February 17, 1984 letter referred to in (f)(7) above to be submitted to the Village Board and to be reflected in the Village Board minutes;

(h) On numerous occasions after March 22, 1984, while acting as a Village Trustee, she voted on, and failed to abstain from voting on, numerous H.U.D.-related matters, including, but not limited to, one vote on September 11, 1986, one vote on April 7, 1987, two votes on June 16, 1988, and one vote on August 18, 1988;

(i) On or about May 18, 1989, she caused Village Board records to be changed to wrongly indicate that on June 16, 1988 she had not voted on H.U.D.-related matters when in fact she had;

(7) She wrote a letter dated February 17, 1984 asking that the Village minutes be changed to indicate that she had abstained from voting on H.U.D.- related matters when the Village minutes correctly documented that she had not abstained;

(8) She induced, and caused Mayor Parente to induce, Harold Scully to write a letter to H.U.D. on or to about March 16, 1984 which falsely stated

that the Village minutes indicating that she had voted on H.U.D.-related matters were inaccurate when, in fact, they were accurate;

(g) On or about May 3, 1984, she caused the false and misleading February 17, 1984 letter referred to in (f)(7) above to be submitted to the Village Board and to be reflected in the Village Board minutes;

(h) On numerous occasions after March 22, 1984, while acting as a Village Trustee, she voted on, and failed to refrain from voting on, numerous H.U.D.-related matters, including, but not limited to, one vote on September 11, 1986, one vote on April 7, 1987, two votes on June 16, 1988, and one vote on August 18, 1988;

(i) On or about May 18, 1989, she caused Village Board records to be changed to wrongly indicate that on June 16, 1988 she had not voted on H.U.D.-related matters when in fact she had;

(j) In 1988, while acting as a Village Trustee, she directly participated in the Village's proposal to obtain Community Development Block Grant funds to build, among other things, a swimming pool by meeting with and discussing the Village's proposal with other Village Trustees, by seeking community support for the Village's proposal, by writing articles, by trying to cause Village residents to withdraw their opposition to the Village's proposal, by openly discussing the Village's proposal in public at Village Board meetings and elsewhere, and by voting on matters connected with the Village's proposal;

**July 31, 1995** **August 9, 1995**

(i) In 1989, while acting as a Village Trustee, she directly participated in the Village's proposal to obtain Community Development Block Grant funds to build, among other things, a swimming pool, by meeting with and discussing the Village's proposal with other Village Trustees, by seeking community support for the Village's proposal, by writing articles, by trying to cause Village residents to withdraw their opposition to the Village's proposal, by openly discussing the Village's proposal in public at Village Board meetings and elsewhere, and by voting on matters connected with the Village's proposal;

(k) In or about August 1989, and thereafter, while being interviewed by members of the H.U.D. Inspector General's office, she made affirmative misrepresentations, made statements which were deceptive, told half-truths that were misleading, and breached her affirmative duty to H.U.D. to make full disclosure about, and not to make material omissions about, the wrongful conduct of the other defendants and her prior breaches of her fiduciary duty. Each of these 1989 misrepresentations, deceptive statements, misleading half-truths, material omissions, and failures to make full and complete affirmative disclosure constituted a new breach of her fiduciary duty to H.U.D.;

(l) She engaged in all of conduct described herein wantonly, maliciously and with wrongful intent.

69. Defendant Geraldine McGann, while acting as a paid Trustee of the Village, voted on matters respecting the expenditure by the Village of H.U.D. funds for the purchase, sale and improvement of the property that was eventually purchased by her son, defendant Daniel McGann, and her daughter-in-law, defendant Eileen McGann.

90. Defendant Geraldine McGann knew and approved of the manipulation of Phases One and Two of the Section 235 Program by defendants Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown, as alleged above, and failed to disclose said manipulation to H.U.D.

91. Defendant Geraldine McGann did these acts, and others, with knowledge that defendants Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown were illegally manipulating the Section 235 Program in the manner set forth above.

(k) In or about August 1989, and thereafter, while being interviewed by members of the H.U.D. Inspector General's office, she made affirmative misrepresentations, made statements which were deceptive, told half-truths that were misleading, and breached her affirmative duty to H.U.D. to make full disclosure about, and not to make material omissions about, the wrongful conduct of the other defendants and her prior breaches of her fiduciary duty. Each of these 1989 misrepresentations, deceptive statements, misleading half-truths, material omissions, and failures to make full and complete affirmative disclosure constituted a new breach of her fiduciary duty to H.U.D.;

(l) She engaged in all of conduct described herein wantonly, maliciously and with wrongful intent.

64. Defendant Geraldine McGann, while acting as a paid Trustee of the Village, voted on matters respecting the expenditure by the Village of H.U.D. funds for the purchase, sale and improvement of the property that was eventually purchased by her son, Daniel McGann, and her daughter-in-law, Eileen McGann.

85. Defendant Geraldine McGann knew and approved of the manipulation of Phases One and Two of the Section 235 Program by the Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown, as alleged above, and failed to disclose said manipulation to H.U.D.

86. Defendant Geraldine McGann did these acts, and others, with knowledge that the Village, Parente, Brady, McGinty, Masone and Scully, and others known and unknown were illegally manipulating the Section 235 Program in the manner set forth above.

---

██ That comparison quickly discloses that the two are virtually identical. That comparison also immediately prompts the obvious observation that the government is attempting an end run around the denial of its motion to amend its complaint by filing a new one, or as it is occasionally put, attempting to accomplish indirectly what it could not accomplish directly. The law's response to such attempts is generally a negative one. Whether that is the appropriate response in this case will, it is submitted, be determined by the doctrine of *res judicata*. The application of that doctrine must be tested against two prior determinations—the dismissal of this cause of action as pleaded in the May 11, 1990 complaint, and the denial of the motion to amend that complaint in 1995.

### A. *The Determination of the May 11, 1990 Complaint*

As has been indicated, the cause of action alleging a breach of fiduciary duty by McGann was dismissed as time-barred. In rejecting the government's assertion that the statute of limitations was tolled by fraudulent concealment, the court held that "the government did in fact have actual knowledge of the acts underlying all of its causes of action on March 2, 1984—at the latest." That was the day on which the HUD Office of the Inspector General issued its report outlining all the facts upon which the government's allegation against McGann were based. 791 F.Supp. at 371. More specifically, the government knew everything alleged in its complaint charging

McGann with breach of fiduciary duty, viz: McGann's participation in the improper marketing of homes in contravention of federal regulations; McGann's violation of Standards of Conduct and a conflict of interest in selecting her son Daniel as a homeowner; McGann's failure to notify the Regional Counsel of HUD that she was a paid member of the Board of Trustees of the Village of Island Park and her failure to receive a determination as to the existence of a conflict of interest until after she served on the Board for eight months during which time she participated in HUD-related decisions in her capacity as trustee; McGann's fraudulent acts which concealed proof in support of allegations contained in the report of the Inspector General; letters written after March 2, 1984 attempting to conceal that McGann voted as a Trustee of the Village on HUD-related matters. That the government knew or should have known by the exercise of even superficial diligence all the facts which it now alleges against McGann in its latest complaint becomes painfully clear from a reading of the court's first opinion, familiarity with which was assumed and is also here encouraged if that assumption is incorrect.

The doctrine of *res judicata* was reviewed at some length in this court's first opinion and its restatement is necessary for a determination of this motion. There are two branches to that doctrine—one being claim preclusion and the other, issue preclusion. The claim preclusion branch requires a final judgment on the merits of an action if the parties or their privies are to be precluded from relitigating issues that were *or could have been raised* in that action. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981). In *Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983), the Court stated it thus, at 129–30, 103 S.Ct. at 2918:

> Simply put, the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, [i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which

might have been offered for that purpose. (Internal quotation marks omitted).

The government contends that *res judicata* is not applicable for the reason that the first opinion of this court granted partial summary judgment to the defendants and such a judgment is not the final judgment that is a prerequisite to the proper invocation of *res judicata.*

"However, to borrow Mr. Justice Brandeis' famous phrase, 'final' also is 'a word of many meanings,' [and] the law of judgments does not use it in relation to conclusiveness, as 28 U.S.C. § 1291 does, to mean only a judgment 'which ends the litigation and leaves nothing for the court to do but execute the judgment.'" *Lummus Co. v. Commonwealth Oil Ref. Co.,* 297 F.2d 80, 89 (2d Cir.1961) (Friendly, J.), *cert. denied,* 368 U.S. 986 (1962). That the word "final" is, indeed, "a word of many meanings" is echoed by the *Restatement, Second, Judgments* § 13 captioned "Requirement of Finality" and which declares:

> **The rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.**

Comment (g) to that section is instructive in its elaboration of the "Criteria for determining finality in the application of issue preclusion,":

> The requirement of finality of judgment is interpreted strictly, ... when bar or merger is at stake.... Usually there is no occasion to interpret finality less strictly when the question is one of issue preclusion, that is, when the question is whether decision of a given issue in an action may be carried over to a second action in which it is again being litigated. (If the second action is on the same claim, preclusion is an instance of direct estoppel; if it is on a different claim, preclusion is an instance of collateral estoppel....) But to hold invariably that that kind of carry-over is not to be permitted until a final judgment in the

strict sense has been reached in the first action can involve hardship—either needless duplication of effort and expense in the second action to decide the same issue, or, alternatively, postponement of decision of the issue in the second action for a possibly lengthy period of time until the first action has gone to a complete finish. *In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment.... Before doing so, the court should determine that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered.* Thus preclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion. The test of finality, however, is whether the conclusion in question is procedurally definite and not whether the court might have had doubts in reaching the decision. (Emphasis added).

*See also* § 27, comment k.

There is a decisive resonance between the Restatement and the leading case of *Lummus Co., supra*, in which the court wrote:

In New York the view that certain determinations on motions may be conclusive as to matters actually litigated goes back as far as *Dwight v. St. John*, 25 N.Y. 203 (1862) and *Riggs v. Pursell*, 74 N.Y. 370 (1878). The Supreme Court of Kansas noted long ago, in a much cited opinion, "a growing disposition to enlarge the scope of the doctrine of res judicata, and to place more regard on the substance of the decision than on the form of the proceedings," *Board of County Commissioners v. McIntosh*, 30 Kan. 234, 238, 1 Pac. 572, 575 (1883). That disposition has continued to grow, see 2 Freeman, *Judgments* (5 ed. 1925), § 668 citing many cases (citations omitted).... *Whether a judgment, not "final" in the sense of 28 U.S.C. § 1291, ought nevertheless be considered "final" in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review. "Finality" in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.* (Emphasis added).

297 F.2d at 89.

*Lummus* has been consistently followed by every circuit which has had occasion to address the issue. *See, e.g., O'Reilly v. Malon*, 747 F.2d 820 (1st Cir.1984); *Kurlan v. Comm. of Internal Revenue*, 343 F.2d 625, 628 n. 1 (2d Cir.1965) (Friendly, J.) ("general expressions that only final judgments can ever have collateral estoppel effect are considerably overstated"); *Morano v. Dillon*, 746 F.2d 942, 945 f.n. 4 (2d Cir.1984); *Zdanok v. Glidden Co.*, 327 F.2d 944, 955 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964) ("we see no reason why in an appropriate case a ruling that is final on [an issue] should not preclude the party against whom the decision ran from presenting further evidence on the issue there finally determined. Dealing with this very question of the kind of finality of judgment necessary to create an estoppel, we pointed out, quite recently, that collateral estoppel does not require a judgment 'which ends the litigation ... and leaves nothing for the court to do but execute the judgment,' ... but includes many dispositions which, though not final in that sense, have nevertheless been fully litigated."); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Swentek v. USAIR, Inc.* 830 F.2d 552, 561 (4th Cir.1987) ("[a]s long as the prior adjudication of the identical issue is conclusive, we see no reason to require the issue to be tried again because it lacked the formality of an express order and a 'no just reason for delay' determination.... Finality for purposes of collateral estoppel is a flexible concept and 'may mean little more than that the litigation of a particular issue has

reached such a stage that a court sees no really good reason for permitting it to be litigated again.'"); *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1191 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476, *and cert. denied*, 460 U.S. 1013, 103 S.Ct. 1254, 75 L.Ed.2d 483 (1983) ("the finality requirement does not necessarily demand the ministerial act of executing a judgment. It does not elevate form over substance in that fashion— the accurate definition of 'finality' in the offensive collateral estoppel context is 'fully litigated'"); *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 855 (7th Cir.1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986) (order sufficiently final for res judicata purposes even if not appealable).

In *Sherman v. Jacobson*, 247 F.Supp. 261, 268 (S.D.N.Y.1965), Judge Feinberg, in a carefully crafted and very instructive opinion convincingly demonstrated why "final" in the *res judicata* or collateral estoppel sense is not synonymous with "final" in the sense of the prerequisite for appellate jurisdiction by examining the policies underlying each. *Res judicata*, he explained, is

> a principle which seeks to bring litigation to an end and promote certainty in legal relations.... The final judgment rule is designed to prevent 'enfeebling judicial administration' which would result from 'permitting the harassment' and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment.... Effectuation of these policies would clearly be hampered if 'final' were given the same meaning in each context. A consistently broad interpretation of the term would flood the appellate courts with piecemeal litigation, while a narrow interpretation would allow a litigant to bring an endless number of law suits.[1] It follows, therefore, that 'final' for res judicata purposes must be construed in the light of the considerations of that doctrine, rather than be automatically equated with 'final' in the final judgment rule.

Judge Feinberg concluded by deciding that a judgment may be final in the collateral estoppel context despite the fact that an appeal has not been decided and may be final as to some matters even though litigation continues as to others.

An application to this case of the factors suggested by *Lummus* and uniformly adopted, to be considered in determining whether a judgment is final for purposes of precluding further litigation compels the conclusion that the motion before the court must be granted. The prior decision reported in 791 F.Supp. 354 (E.D.N.Y.1992) was not tentative; the extensive briefs and comprehensive oral arguments plainly satisfied the "adequacy of the hearing" factor and in the nearly five years that has elapsed since, there has been more than ample opportunity for review. Indeed, the litigation of the discrete issue of breach of fiduciary duty has reached such a stage that this court sees no good reason for permitting it to be litigated yet again.

### B. *The Denial of the Motion to Amend the Complaint*

In the brief prologue to this decision, reference was made to the denial of the plaintiff's motion to amend its complaint which, though not reported in the Federal Supplement, can be found in 1995 WL 669936. In denying that motion, I noted that the government offered no reason why it waited more than three years to amend its complaint and found not only that the delay was inordinate but also that the proposed amendments were unduly prejudicial because several key witnesses have died and the memory of others has been dimmed. The considerations leading to the denial of that motion are precisely applicable to this new complaint presented in the guise of a new action which is virtually identical to the one unsuccessfully sought to be amended. I characterized this earlier as attempting to accomplish indirectly what couldn't be accomplished directly and made reference to the jaundiced eye with which the law has almost always looked at such at-

---

1. In light of the number of law suits thus far brought on the discrete issue in this case, Judge

Feinberg's last observation was exquisitely prescient.

tempt. That such attempts have been looked at with askance by others is reflected in their decisions and provides an additional basis for granting this motion.

 In *Sendi v. NCR Comten, Inc.*, 624 F.Supp. 1205 (E.D.Pa.1986), a second complaint was filed which was identical to a complaint sought to be amended by a motion which was denied. The court granted the defendant's motion to dismiss the second complaint, relying in part upon the doctrine of *res judicata* as intended to prevent repetitive litigation and stating that "the fact that plaintiff was denied leave to amend does not give him the right to file a second lawsuit based on the same facts." *Id.* at 1207. The court then quoted from *Walton v. Eaton Corp.*, 563 F.2d 66, 71 (3d Cir.1977) which held that a district court "must insure that the plaintiff does not use the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rule [ ] pertaining to the amendment of complaints. Fed. R.Civ.Proc. 15." and then added that the plaintiff's proper course was to appeal from the denial of his motion to amend citing as authority for that *Poe v. John Deere Co.*, 695 F.2d 1103, 1107 (8th Cir.1982).[2]

In *Carter v. The Money Tree Company*, 532 F.2d 113 (8th Cir.), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2636, 49 L.Ed.2d 380 (1976), the court held that if upon dismissal of a complaint the plaintiff then fails to obtain leave to file an amended complaint, the denial is *res judicata* as to any claim made by the plaintiff in that amended complaint. *See also Rinehart v. Locke*, 454 F.2d 313, 315 (7th Cir.1971); *King v. Hoover Group, Inc.*, 958 F.2d 219, 222–23 (8th Cir.1992) ("It is well settled that denial of leave to amend constitutes res judicata on the merits of the claims which were the subject of the proposed amended pleading."); *In re Dual–Deck Video Cassette Recorder Antitrust Litig. v. Matsushita Elec. Indus. Co., Ltd.*, MDL No. 765 PHXRCB, 1991 WL 425379, at *2 (D.Ariz. Jan. 7, 1991) (although no final judgment was rendered in the earlier action, allowing the

second action would effectively reverse the court's denial of leave to amend.)

For all of the foregoing reasons, the defendant's motion to dismiss the complaint must be granted.

SO ORDERED.

---

**2.** It should be noted that in the Second Circuit the denial of a motion to amend a complaint is not appealable. *See, e.g., Richardson Green-shields Securities, Inc. v. Lau*, 825 F.2d 647 (2d Cir.1987); *see also*, Wright, Miller & Kane, *Federal Practice & Procedure*, Civil 2d § 1484 n. 7.